PHONETELE, INC., Plaintiff-Appellant,

v.

AMERICAN TELEPHONE AND TELE-
GRAPH COMPANY; Western Electric
Company, Incorporated; Bell Telephone
Laboratories, Incorporated, Defendants-
Appellees.

DASA CORPORATION, etc., Appellant,

v.

GENERAL TELEPHONE COMPANY OF
CALIFORNIA, et al., Appellees.

Nos. 77–3877, 77–2936.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted May 7, 1979.

Submission Ordered Vacated
Nov. 20, 1979.

Reargued and Resubmitted Feb. 6, 1980.

Decided Dec. 3, 1981.

As Amended March 15, 1982.
Rehearing and Rehearing En Banc Denied
March 31, 1982.

Ron Landsman, John H. Shenefield, Robert B. Nicholson, Washington, D. C., amicus curiae, for United States.

Paul S. Sigelman, Rick M. Stein, Sigelman & Stein, Beverly Hills, Cal., for Phonetele, Inc.

Robert J. White, O'Melveny & Myers, Los Angeles, Cal., C. Daniel Ward, Stamford, Conn., Dezendorf, Spears & Lubersky, Portland, Or., Robert G. Lane, Charles Bender, Paul, Hastings & Janofsky, Los Angeles, Cal., for General Telephone Co. of Cal., etc.

Frank Rothman, Wyman, Bautzer, Rothman & Kuchel, Los Angeles, Cal., George L. Saunders, Jr., Sidley & Austin, Chicago, Ill., Harold S. Levy, New York City, for American Telephone & Telegraph Co., etc.

Before KENNEDY and FLETCHER, Circuit Judges, and CLAIBORNE,* District Judge.

KENNEDY, Circuit Judge:

These consolidated appeals present to this circuit the question whether a telephone company may be sued for damages and injunctive relief for attempting to monopolize and restrain trade in the distribution and sale of telephone terminal equipment.[1] The case requires us to reconcile the anti-

Ronald L. Bauer, McGuire & Bauer, Tustin, Cal., for DASA Corp.

---

* Honorable Harry E. Claiborne, Chief Judge, United States District Judge for the District of Nevada, sitting by designation.

1. Many courts have addressed the question; the Second, Third, Fifth, and Eighth Circuits have refused to accord immunity under similar circumstances. See *Northeastern Tel. Co. v. American Tel. & Tel. Co.*, 651 F.2d 76 (2d Cir. 1981); *Sound, Inc. v. American Tel. & Tel. Co.*, 631 F.2d 1324 (8th Cir. 1980); *Essential Communications Sys., Inc. v. American Tel. & Tel. Co.*, 610 F.2d 1114 (3d Cir. 1979); *Litton Sys.,* *Inc. v. American Tel. & Tel. Co.*, 487 F.Supp. 942 (S.D.N.Y.1980); *Monitor Business Machs., Inc. v. American Tel. & Tel. Co.*, 1978–1 Trade Cas. (CCH) ¶ 62,030 (C.D.Cal.1978); *Jarvis, Inc. v. American Tel. & Tel. Co.*, 481 F.Supp. 120 (D. D.C.1978); *Interconnect Planning v. American Tel. & Tel. Co.*, 465 F.Supp. 811 (S.D.N.Y.1978); *Macom Prods. Corp. v. American Tel. & Tel. Co.*, 359 F.Supp. 973 (C.D.Cal.1973). In addition, the District Court for the District of Columbia has twice found no blanket immunity in a civil suit by the United States Government that concerned in part terminal equipment.

trust laws with the regulatory regime established by the Communications Act of 1934, 47 U.S.C. §§ 151–609 (1976 & Supp. III 1979) [FCA or Act].

Plaintiff Phonetele, Inc., manufactures and sells the "Phonemaster," equipment connected to a telephone to prevent the user from placing calls beyond a predetermined area. Plaintiff DASA Corp. manufactures equipment known as "Divert-A-Call" which is connected to a telephone and effects automatic transfer of an incoming call to another telephone number. Both devices are attached by electric connections.

The complaints in these actions arose from the tariffs filed by the defendants with the Federal Communications Commission [FCC] and the California Public Utilities Commission [CPUC], tariffs which prohibited the direct electrical connection of customer-provided equipment to the telephone without the use of a plate-like connecting device, called a "protective connecting arrangement" or "PCA," supplied by the telephone company. Plaintiffs allege that the filing and implementation of these tariffs violated the antitrust laws.

DASA filed its complaint in 1973, alleging violations of sections 1 and 2 of the Sherman Act by General Telephone of California [General Telephone or General], by Ford Industries as manufacturer of an automatic call diverter, and by others unnamed. Damages and injunctive relief were sought.[2] As for the section 1 violations, the complaint generally alleges that since 1966 the defendants combined to unreasonably restrain trade in the call diverter market in those areas of California in which General has a state-granted monopoly in telephone system operation. The alleged goal of the concert and agreement was to suppress competition.[3] DASA's section 2 monopolization claim is that General

United States v. American Tel. & Tel. Co., 461 F.Supp. 1314 (D.D.C.1978); United States v. American Tel. & Tel. Co., 427 F.Supp. 57 (D.D. C.1976). Several courts have addressed the analogous problem in the areas of private long-lines communications and interconnection with local telephone companies, generally finding no implied immunity. See, e. g., Mid-Texas Communications Sys., Inc. v. American Tel. & Tel. Co., 615 F.2d 1372 (5th Cir.), cert. denied, 449 U.S. 912, 101 S.Ct. 286, 66 L.Ed. 2d 140 (1980); MCI Communications Corp. v. American Tel. & Tel. Co., 462 F.Supp. 1072 (N.D.Ill.1978). One court of appeals has addressed the immunity issue in the fairly specialized field of radio/telephone paging systems, and found such immunity on the basis of the state action exemption. Mobilfone v. Commonwealth Tel. Co., 571 F.2d 141 (3d Cir. 1978). The general problem has attracted some attention in the literature. See Note, The Application of Antitrust Law to Telecommunications, 69 Calif.L.Rev. 497 (1981); Note, Antitrust and Regulated Industries: A Critique and Proposal for Reform of the Implied Immunity Doctrine, 57 Tex.L.Rev. 751 (1979); Note, AT&T and the Antitrust Laws: A Strict Test for Implied Immunity, 85 Yale L.J. 254 (1975).

2. In view of the actions taken by the FCC and the CPUC, DASA's request for equitable relief is moot.

3. Specifically, the complaint alleges, without limitation, the following acts on the part of the defendants:

1. The knowing filing of anticompetitive and unlawful tariffs prohibiting any interconnection of non-telephone company equipment;

2. Replacement of those tariffs, following a determination of their illegality, with new, purposefully anticompetitive tariffs requiring (a) the installation of unnecessary protective couplers actually designed to prevent the Divert-A-Call from working and (b) the payment of unnecessary and unreasonable installation and monthly charges;

3. Ford's sale of call diverters to General Telephone, accompanied by General's assistance of Ford's efforts to develop a diverter comparable to DASA's, as well as General Telephone-Ford negotiations towards Ford's future sales to General of its improved call diverters;

4. General Telephone's use of the inconvenience and increased costs imposed on Divert-A-Call users by its tariffs as a point in the promotion of its own call diverters;

5. General's enforcement of its tariffs with threats of termination of Divert-A-Call users' phone service;

6. General Telephone's failure to follow the CPUC's 1972 order to negotiate in good faith with DASA reasonable assurances regarding quality control, installation, and repair that would permit direct connection of Divert-A-Calls;

7. Attempts by General and its co-conspirators to frustrate CPUC and other governmental proceedings dealing with interconnection in order to prolong their unfair competitive advantage.

and its co-conspirators have controlled at least 90 percent of the automatic call diverter market in those areas of California in which General operates and that defendants have monopolized the market and have undertaken to destroy actual and potential competitors.[4]

Phonetele's 1974 complaint charges that American Telephone & Telegraph Company [AT&T], the 23 operating companies in which it has major interests, and AT&T subsidiaries Western Electric and Bell Telephone Laboratories,[5] have combined and agreed to restrain commerce in the marketing, sales, and distribution of the Phonemaster, conspired to monopolize the terminal equipment market, and have effected tying arrangements, all in violation of sections 1 and 2 of the Sherman Act, and section 3 of the Clayton Act. Phonetele claims that AT&T and its operating companies control approximately 80 percent of the nation's telephone lines, and that this gives AT&T complete power over all 1,700 independent telephone companies which must use these interstate lines. Misconduct in the establishment and enforcement of an AT&T tariff requiring a coupling device for

equipment like Phonetele's is also charged. Finally, Phonetele alleges AT&T was wrongfully responsible for conforming state tariffs and enforcement efforts. Phonetele alleged damages in excess of $30 million. It sought trebling of those damages and injunctive relief. Phonetele has since stated that it will no longer seek injunctive relief.[6]

The district courts below dismissed the actions on the grounds that the FCC (and state utilities commissions where appropriate) had "exclusive jurisdiction" over the subject of interconnection of terminal equipment with the telephone system and that the FCA conferred an implied antitrust immunity for the activities of the defendants.[7]

The immunity issue in Phonetele's appeal concerns the nature and extent of the FCC's regulation pursuant to the scheme created by the Act; DASA's case involves additional and similar issues concerning the CPUC.

## I. REGULATORY SCHEME

The FCA provides for the regulation of telecommunications common carriers by the

These acts, DASA contends, harmed competition, telephone users, and itself.

4. In the event that the defendants and co-conspirators did not have monopoly power in the relevant market, DASA claims that (1) there was a dangerous possibility that a monopoly would be established; (2) the defendants and co-conspirators specifically intended to create such a monopoly; (3) the previously detailed acts were in furtherance of an attempt and conspiracy to monopolize; and (4) that attempt should be enjoined and damages should be awarded to DASA. Finally, DASA charges the defendants and co-conspirators with wrongful interference with DASA's contractual relations with its customers.

5. The complaint does not detail misconduct by Western Electric and Bell Telephone Laboratories, the manufacturing and research arms of AT&T. The complaint, in that it alleges an overly protective tariff and delay and error in the design of protective couplers, however, implies misconduct by the AT&T subsidiaries.

6. Phonetele charges that AT&T and the operating companies have misinterpreted the tariffs so as to apply to the Phonemaster while knowing that the Phonemaster is not covered by the

tariffs, or, even if the Phonemaster is covered, knowing that the Phonemaster requires nothing more for connection than a simple terminal block. Phonetele, although objecting to the poor quality of the PCA made available in California and to the fees associated with that coupler, also complains of AT&T's delay in making a similar protective coupler available in other parts of the United States. When a similar coupler finally was made available outside of California, Phonetele charges that it was three and one-half times as expensive as the already too expensive California coupling arrangement. Phonetele claims that the imposition of protective coupling arrangements has caused unnecessary design and installation problems and attendant delays and has caused either Phonetele or Phonetele's customers to bear unnecessary costs.

In sum, Phonetele claims that AT&T and the operating companies have used their monopoly position to ensure that their own customers shall use only telephone company equipment.

7. See Phonetele, Inc. v. American Tel. & Tel. Co., 435 F.Supp. 207 (C.D.Cal.1977); DASA Corp. v. General Tel. Co., 1977–2 Trade Cas. (CCH) ¶ 61,610 (C.D.Cal.1977).

FCC and requires carriers to file tariffs with the FCC covering "practices" as well as charges.[8] Before changing any of its practices by filing a new tariff, the carrier must give ninety days notice to the FCC and the public.[9] The requirement that carriers file tariffs is the primary mechanism of regulation. Once a tariff becomes effective, the carrier is required to adhere to its provisions.

Section 201(b) requires that "[a]ll charges, practices, classifications, and regulations" be "just and reasonable." The section further states that "any such charge, practice, classification, or regulation that is unjust or unreasonable is declared to be unlawful." Any unjust or unreasonable discrimination in carrier conduct is unlawful. 47 U.S.C. § 202 (1976). Section 201(b) authorizes the FCC to prescribe "such rules and regulations as may be necessary in the public interest" to implement the Act's mandates.

Free competition is not irrelevant to the objectives of utility regulation, but determinations of whether a company's practices are in the public interest as defined by the Act require FCC consideration of factors other than competition. Such factors include network safety and efficiency, the need of the public for reliable service at reasonable rates, the proper allocation of the rate burden, the financial integrity of the carriers, and the future needs of both users and carriers.[10]

Whenever a new tariff is proposed, the FCC may, upon its own initiative or upon the complaint of an interested party, hold hearings concerning the lawfulness of the practice, and may suspend the tariff.[11] Section 205 authorizes the FCC, after hearings and upon a finding that a tariff does or will violate the Act, to issue a cease and desist order and to prescribe conduct to satisfy the Act's standards.[12]

The Act gives the FCC broad jurisdiction over interstate and foreign telephone com-

---

8. Section 203(a) of the Act, 47 U.S.C. § 203(a) (1976), requires such carriers to file tariffs with the FCC "showing all charges ... and showing the classifications, practices, and regulations affecting such charges."

9. 47 U.S.C. § 203(b) (1976).

10. See Washington Util. & Transp. Comm'n v. FCC, 513 F.2d 1142 (9th Cir.), cert. denied, 423 U.S. 836, 96 S.Ct. 62, 46 L.Ed.2d 54 (1975). See generally FCC v. RCA Communications, Inc., 346 U.S. 86, 73 S.Ct. 998, 97 L.Ed. 1470 (1953); Hawaiian Tel. Co. v. FCC, 498 F.2d 771, 777 (D.C.Cir.1974); Northeastern Tel. Co. v. American Tel. & Tel. Co., 477 F.Supp. 251, 253 (D.Conn.1978), rev'd, 651 F.2d 76 (2d Cir. 1981); Satellite Bus. Sys., 62 F.C.C.2d 997 (1977).

There is a pro-competitive policy embodied in the FCA, although it is a corollary of the more basic policy of favoring customer utility and freedom of choice. See Proposal for New or Revised Classes of Interstate and Foreign Message Toll Telephone Service (MTS) and Wide Area Telephone Service (WATS), Second Report and Order, 58 F.C.C.2d 736, 740 (1976) [Second Report].

11. 47 U.S.C. § 204 (1976). The FCC may suspend operation of the new tariff for up to five months. Id. § 204 (Supp. IV 1980). If the FCC has not completed its hearings by that date, the new tariff becomes effective subject to subsequent invalidation by the Commission.

12. Failure to obey an FCC order will result in a $1,000 fine for every violation, to be levied each day in the case of continuing offenses. 47 U.S.C. § 205(b) (1976). A carrier found to have violated the Act is liable to any person injured as a result of that violation for the "full amount of damages sustained," plus the attorney's fees of the injured person. 47 U.S.C. § 206 (1976). Section 207 establishes two avenues of recovery. An injured party may sue for damages "in any district court of the United States", or the party may file a complaint with the Commission pursuant to section 208. When a person claiming injury files a complaint with the Commission, the carrier is required to respond in writing. 47 U.S.C. § 208 (1976). If, after receiving the carrier's response, the party chooses to pursue his complaint, the Commission must investigate whether there appear to be any reasonable grounds supporting the complaint. Id. If the FCC concludes that the party is entitled to damages, it may order the carrier to pay the complaining party. 47 U.S.C. § 209 (1976).

For other descriptions of the FCA, see, e. g., Essential Communications Sys., Inc. v. American Tel. & Tel. Co., 610 F.2d 1114, 1117–20 (3d Cir. 1979); Northeastern Tel. Co. v. American Tel. & Tel. Co., 477 F.Supp. 251, 253 (D.Conn. 1978), rev'd, 651 F.2d 76 (2d Cir. 1981).

munications and the carriers which provide such communications; intrastate communications are excepted.[13] General Telephone provides service to a part of California only and so is not subject to the comprehensive direct supervision of the FCC and does not file general tariffs with it. To the extent the facilities of a connecting carrier such as General are used for interstate or foreign communications, it usually files a state tariff that conforms to the tariff the interstate carrier has filed with the FCC. In the case of telephone service, this mechanism of a "conforming tariff" means that when the facilities of an intrastate telephone company are used for interstate communications, the company is thus indirectly subject to the tariffs filed by AT&T.

Terminal equipment is primarily used for intrastate services and is generally provided by a connecting carrier rather than an interstate carrier. For this reason, state public utility commissions have in the past exercised authority over the connection of such equipment, as CPUC did with General. Now, however, the FCC asserts "primary authority" over interconnection of customer-provided equipment, to the exclusion of state regulation.[14] This exercise of jurisdiction was affirmed in *North Carolina Util. Comm'n v. FCC*, 537 F.2d 787 (4th Cir.), cert. denied, 429 U.S. 1027, 97 S.Ct. 651, 50 L.Ed.2d 631 (1976).

## II. CHALLENGES TO AT&T'S EXCLUSION OF FOREIGN ATTACHMENTS

Tariffs filed with the FCC immediately following passage of the Communications Act generally prohibited the interconnection of customer-provided equipment.[15] The restrictions were similar to those contained in tariffs required by most state utility commissions before the Act was adopted.[16]

In 1965, AT&T's tariff prohibiting foreign attachments was challenged in an anti-

---

**13.** The Act explicitly states that nothing contained in the chapter on common carriers "shall be construed to apply or to give the Commission jurisdiction with respect to (1) charges, classifications, practices, services, facilities, or regulations for or in connection with intrastate communication service by wire or radio of any carrier . . . ." 47 U.S.C. § 152(b) (1976). That section further provides that, with certain exceptions (47 U.S.C. §§ 201–205 (1976)), the Commission shall not have jurisdiction over any "connecting carrier," i. e., a carrier which provides interstate communication only through physical connection with another carrier not controlling it or controlled by it. *Id.*

**14.** In the present case, for example, the CPUC regulates General. Yet because terminal equipment generally has the potential to be used in interstate telephone connections, any restriction on its connection contained in the tariffs filed by AT&T would also apply to terminal equipment of intrastate carriers. *See Telerent Leasing Corp.*, 45 F.C.C.2d 204, 216 n.21 (1974). Until recently, however, there appeared to be no reason why a state could not apply more restrictive regulations for the interconnection of customer-provided terminal equipment.

**15.** In 1956 AT&T's blanket prohibition against connecting any equipment was struck down as a violation of the FCA. *Hush-A-Phone Corp. v. United States*, 238 F.2d 266 (D.C.Cir.1956), after remand, 22 F.C.C. 112 (1957). The "Hush-A-Phone" was a cup-shaped device which attached to the mouthpiece of the handset to provide privacy for the speaker and quiet for others near the phone. There was no electrical connection between the telephone and the Hush-a-Phone. AT&T responded to this decision by filing a tariff which prohibited all "direct electrical connection" and interconnection by any means of customer-provided equipment. *See Carterfone*, 13 F.C.C.2d at 437–38.

**16.** Many state public utilities commissions apparently felt that the telephone company must maintain end-to-end responsibility to preserve the integrity and reliability of the telephone network. For example, when some telephone companies permitted users to provide their own equipment, some state regulatory agencies ordered the carriers to purchase that equipment from the customers, thus highlighting the carrier's responsibility for maintaining the system. *See, e. g., Bluffs & Winchester Tel. Co.*, P.U.R. 1915A 928 (Ill.Pub.Util.Comm'n 1915); *Franksville Tel. Co.*, P.U.R. 1917A 270 (Wis. R.R. Comm'n 1916); *Littlepage v. Mosier Valley Tel. Co.*, P.U.R. 1918E 425 (Or.Pub.Serv. Comm'n 1918); *Swanson*, P.U.R. 1920E 633 (Cal. R.R. Comm'n 1920). *See also Quick Action Collection Co. v. New York Tel. Co.*, P.U.R. 1920D 137 (N.J.Bd.Pub.Util.Comm'rs 1920) (rejecting attempt by customer to replace parts of telephone company equipment); *City of Los Angeles v. Southern Cal. Tel. Co.*, 2 P.U.R. (n.s.) 247, 249–50 n.1 (Cal. R.R. Comm'n 1933) (same) (collecting cases).

trust action. The Court of Appeals held that the antitrust complaint was properly stayed while the case was referred to the FCC to determine the legality of the prohibition under the FCA. *See Carter v. American Tel. & Tel. Co.*, 250 F.Supp. 188 (N.D. Tex.), *aff'd*, 365 F.2d 486 (5th Cir. 1966), *cert. denied*, 385 U.S. 1008, 87 S.Ct. 714, 17 L.Ed.2d 546 (1967).[17] In 1966 the FCC began its investigation, and in 1968 the Commission issued its watershed decision in *Use of the Carterfone Device in Message Toll Telephone Service*, 13 F.C.C.2d 420, *reconsideration denied*, 14 F.C.C.2d 571 (1968) [*Carterfone*]; this decision was strongly presaged by the foundation laid in *Hush-A-Phone Corp.*, 22 F.C.C. 112 (1957) (on remand).[18] The FCC found the then-applicable tariff unreasonable because it "prohibit[ed] the use of harmless as well as harmful devices." *Carterfone*, 13 F.C.C.2d at 424. The FCC struck down the entire tariff and allowed the carriers to "submit new tariffs which will protect the telephone system against harmful devices, and [which] may specify technical standards if they wish." *Id.* at 426. The Commission offered no specific guidance as to the content of the new tariffs.

AT&T responded in November of 1968 by filing an amended version of Tariff No. 263 [the post-*Carterfone* tariff]. This tariff permitted acoustical or inductive connection of customer-provided terminal equipment. It continued, however, to prohibit the direct electrical connection of network control signalling units.[19] Under the tariff, these devices could only be interconnected indirectly by means of the protective connecting arrangement (PCA). The PCA had to be provided and installed by the telephone company before equipment such as a call diverter could be connected.

Various parties objected to the tariff and requested the FCC to reject or suspend it. The FCC declined to do so but it also declined to affirm its validity. The Commission ruled that the post-*Carterfone* tariff filed by AT&T did not violate the precise holding in *Carterfone*. *American Telephone and Telegraph Co. "Foreign Attachment" Tariff Revisions*, 15 F.C.C.2d 605 (1968), *reconsideration denied*, 18 F.C.C.2d 871 (1969) [*AT&T "Foreign Attachment" Tariff Revisions*].[20] The Commission further indicated that it planned to undertake a broad study of interconnection practices and permitted the tariff to go into effect, while explicitly and significantly withholding its approval of the tariff.[21]

17. The plaintiff in that action manufactured a device known as the "Carterfone." The Carterfone connected acoustically and inductively (as opposed to electrically) to the telephone and permitted the caller to connect his telephone to a two-way radio. *Carter*, 365 F.2d at 490.

18. *See* note 38 *infra*.

19. "Network control signals" are electronic impulses which activate connections between telephone centers, control switches, and start and stop the equipment used for billing. Devices that generate or activate network control signals are a category of terminal equipment known as "network control signaling units" (NCSUs). According to the defendants, plaintiffs' devices are network control signalling units and have the potential to disrupt system operations and message accounting if not properly manufactured, installed, and maintained. *See also* notes 20 & 38 *infra* (discussing legal significance of NCSU/non-NCSU distinction).

20. We must emphasize that our interpretation of this statement by the Commission supports

our holding. The post-*Carterfone* tariff was not "in conflict" with *Carterfone* in the sense that *Carterfone* did not deal specifically with customer replacement of terminal equipment, and the Commission had not been, in 1968, in a position to say whether the suggested possibility of greater danger from NCSUs was so substantial or unpredictable as to permit a blanket prohibition by AT&T. *See* notes 21, 38, & 43 *infra* (discussing *Carterfone* and subsequent interpretations of decision).

21. In our opinion, these and other matters warrant further consideration by the Commission before it determines whether and what further action, if any, may be required. We believe that we will be in a better position to make these determinations after we have had a reasonable opportunity to closely observe the effects of the substantial changes now being effectuated by the telephone companies in their interconnection tariffs, the extent to which such changes satisfy reasonable requirements of their subscribers for ... communication services or facilities, and the implementation by the telephone companies of

Proceeding informally at first, the FCC embarked on an extensive investigation of the interconnection issue.[22] These proceedings culminated in *Proposals for New or Revised Classes of Interstate and Foreign Message Toll Telephone Service (MTS) and Wide Area Telephone Service (WATS)— First Report and Order, [First Report].*[23] The FCC concluded that the conditions on interconnection of customer-provided terminal equipment contained in Tariff No. 263 unnecessarily restricted the customer's right to make reasonable use of telephone services and facilities and that such conditions constituted an unjust and unreasonable discrimination. In the same report, the FCC prescribed a system of registration for customer-provided equipment based on various technical specifications. *See* 47 C.F.R. §§ 68.100–.506 (1980). For equipment which did not meet the specifications, the carriers were permitted to require PCAs.

Developments before the CPUC have loosely paralleled those before the FCC. General Telephone's tariffs filed with the CPUC prior to 1966 prohibited the connection of customer-provided equipment to the telephone system. Before *Carterfone*, the CPUC strongly disapproved General's restrictions on devices like Divert-A-Call.[24] After *Carterfone*, General filed a tariff with the CPUC which mirrored the amended tariff No. 263 filed by AT&T with the FCC. This General tariff was challenged in 1972.[25] Subsequently, on October 24, 1973, the CPUC commenced an investigation into

their representations that they are actively engaged in devising equipment and operating procedures to meet the expressed needs of customers for flexible access to the switched network. Thus, *we will permit the tariff revisions to become effective as scheduled with the understanding that in doing so we are not giving any specific approval to the revised tariffs.*
AT&T "Foreign Attachment" Tariff Revisions, 15 F.C.C.2d at 610 (emphasis added).
The Commission took this stance because it was then "in no position to determine the extent to which" interconnection of customer-provided equipment could properly be permitted "consistent with efficient and economic telephone service." *Id. See also AT&T "Foreign Attachment" Tariff Revisions*, 18 F.C.C.2d 871, 873 (1969) (denying petitions for reconsideration); *Western States Tel. Co.*, 19 F.C.C.2d 1068, 1072–73 (1969). It did, however, indicate that AT&T could consider the safety of the telephone network in formulating the new tariff. *Carterfone*, 14 F.C.C.2d at 572–73 (denying petitions for reconsideration).

22. The FCC commissioned a study by the National Academy of Sciences and gathered information from other sources. In June, 1972, the FCC began formal proceedings to determine whether the post-*Carterfone* tariffs should be revised. Many users, equipment suppliers, and carriers participated in the hearings. The agency created a federal-state joint board to investigate interconnection practices. At about the same time, many state utilities commissions undertook independent investigations of the same issues. The potential for conflicting regulatory schemes led the FCC in 1974 to assert "paramount" or "primary" jurisdiction over the terms and conditions governing the interconnection of all equipment used in inter-

state communications. *Telerent Leasing Corp.*, 45 F.C.C.2d 204 (1974), *aff'd sub nom. North Carolina Util. Comm'n v. FCC*, 537 F.2d 787 (4th Cir.), *cert. denied*, 429 U.S. 1027, 97 S.Ct. 651, 50 L.Ed.2d 631 (1976). After the *Telerent* decision, state utilities commissions still have authority over the rates and charges for interconnection and carrier-supplied terminal equipment. *See North Carolina Util. Comm'n v. F.C.C.*, 552 F.2d at 1047–48.

23. 56 F.C.C.2d 593 (1975), *modified in part*, 57 F.C.C.2d 1216 (1976), *aff'd sub nom. North Carolina Util. Comm'n v. FCC*, 552 F.2d 1036 (4th Cir.), *cert. denied*, 434 U.S. 874, 98 S.Ct. 222, 54 L.Ed.2d 154 (1977).

24. In 1966, the CPUC found a call diverter functionally similar to the Divert-A-Call not to present any significant hazard to the telephone system. The CPUC ordered General to allow interconnection of that device without a connecting arrangement or to purchase and supply the device itself.

25. DASA's predecessor in interest, Com-U-Trol, filed an action before the CPUC in February, 1972, to compel General Telephone to allow interconnection of the Divert-A-Call. Although the CPUC ordered that General "shall permit the direct electrical connection of Divert-A-Calls to the telephone network subject to the condition that complainant shall provide reasonable assurances that quality control, installation, and repair procedures . . . necessary for the preservation of network integrity and safety will be uniformly followed," Interim Decision No. 80972, Com-U-Trol and General were unable to come to agreement on the necessary procedures.

the terms and conditions of interconnection of customer-provided equipment. On April 22, 1975, the CPUC issued an Interim Decision, which became final in May, 1976, and which, like the FCC First Report, adopted a dual system of direct electrical connection of certified devices and the use of protective connecting arrangements for uncertified devices.

Following is a summary of the regulatory pattern applicable to the interconnection of customer-provided equipment. Prior to 1966, the tariffs filed by General Telephone and AT&T prohibited the connection of any customer-supplied terminal equipment and there was virtually no active regulatory effort by either the CPUC or the FCC. The year 1966 marked the start of agency regulatory activity, and between 1966 and 1975 both the FCC and the CPUC undertook studies of the problem. The *Carterfone* decision in 1968 established that there was no justification for a telephone company to enforce a blanket prohibition on all foreign attachments and it further established that tariffs for such attachments should be designed only to prohibit devices dangerous to the system. After the FCC *Carterfone* decision, the direct electrical connection of terminal equipment was affected by telephone company tariffs which required PCAs, furnished by the company, as a condition to permitting direct electric connection of terminal equipment. In 1975, the FCC proposed a comprehensive new plan based largely on the requirement of registration or certification for terminal equipment. The CPUC proposed a similar plan, which became final the following year.

Phonetele first entered the business of developing and manufacturing telephone restriction equipment in late 1970, about two years after the post-*Carterfone* tariffs were filed. Phonetele's complaint was filed

on December 15, 1974, and is based on the defendants' conduct after the FCC's *Carterfone* decision. In addition to alleging that the PCA requirement was anticompetitive, Phonetele's complaint alleged that AT&T misinterpreted its own tariffs, delayed the availability of PCAs for Phonemasters outside of California, and charged three and one half times as much for PCAs outside California as in California, all without justification.[26] DASA's complaint was filed in late 1973 and was based primarily on acts which occurred during the period of active regulatory investigation by the FCC and CPUC but before the registration program was adopted. DASA alleged that the pattern of conduct described in controlling AT&T tariffs and tariffs filed by General with the CPUC violated sections 1 and 2 of the Sherman Act.[27]

## III. IMPLIED ANTITRUST IMMUNITY

Whether there is an implied immunity under the Communications Act is a question of Congress' intent in passing the Act. *Mt. Hood Stages, Inc. v. Greyhound Corp.*, 555 F.2d 687, 691 (9th Cir. 1977), *cert. denied in part*, 434 U.S. 1008, 98 S.Ct. 716, 54 L.Ed.2d 750, *vacated and remanded on other grounds*, 437 U.S. 322, 98 S.Ct. 2370, 57 L.Ed.2d 239 (1978).[28] The Supreme Court has given repeated emphasis to the proposition that antitrust immunities are to be strictly construed and not lightly inferred. An implied immunity may be found only where there is "a convincing showing of clear repugnancy between the antitrust laws and the regulatory system." *United States v. National Ass'n of Sec. Dealers*, 422 U.S. 694, 719–20, 95 S.Ct. 2427, 2442–2443, 45 L.Ed.2d 486 (1975) [*NASD*]; *see also Gordon v. New York Stock Exch., Inc.*, 422 U.S. 659, 682, 95 S.Ct. 2598, 2611, 45 L.Ed.2d 463 (1975). "These widely repeated refrains

---

**26.** *See* p. 720 and notes 5 & 6 *supra*.

**27.** *See* pp. 720–721 and notes 2–4 *supra*.

**28.** No section of the FCA expressly confers immunity in the area of interconnection, and

defendants do not contend Congress intended any blanket immunity. *See Sound, Inc. v. American Tel. & Tel. Co.*, 631 F.2d 1324, 1327 (8th Cir. 1980). Rather, the narrower claim is that immunity should be implied in the discrete context of interconnection.

. . . are of limited value in application,"[29] however. One point must be plain: we must recognize there is no simplistic and mechanically universal doctrine of implied antitrust immunity; each of the Supreme Court's cases is decisively shaped by considerations of the special aspects of the regulated industry involved. From this two further points follow. First, we do not accept as dispositive any of the elaborate taxonomies that have attempted to wrest an abstract framework out of the case law.[30] Second, the uncritical transfer of abstract characterizations about the implied immunity of one industry to the different circumstances of another industry is not a reliable method of analysis.[31] Vague metaphors such as "aggressive regulation" are likewise inadequate tools of analysis.

Relying heavily on *NASD* and *Gordon*, defendants posit three principal arguments in support of implied immunity. First, defendants claim application of the antitrust laws would subject them to inconsistent and conflicting standards and obligations, thereby demonstrating a clear repugnancy between the antitrust laws and the FCA. Second, defendants maintain the conduct at issue here is subject to pervasive regulatory authority and thus impliedly immune from the antitrust laws. Third, defendants argue that even if the regulatory scheme is not deemed pervasive, antitrust immunity is required because the conduct is aggressively regulated by an agency under direct statutory authority.

### A. *Gordon*

▮▮▮▮ Turning to the third argument first, we cannot accept defendants' overly broad reading of *Gordon*. According to the defendants, *Gordon* requires antitrust immunity where the challenged conduct is aggressively regulated by an agency vested with direct statutory authority to do so, regardless of whether the regulatory scheme, taken in its entirety, is sufficiently "pervasive" as to require immunity, and regardless of whether the agency ultimately approves or disapproves the challenged conduct. On close examination *Gordon* does not support such an extensive immunity doctrine.[32] The necessity of considering im-

---

**29.** *Northeastern Tel. Co. v. American Tel. & Tel. Co.*, 477 F.Supp. 251, 256 (D.Conn.1978), *rev'd*, 651 F.2d 76 (2d Cir. 1981).

**30.** *See* Notes, *supra* note 1.

**31.** For example, the immunity analysis in securities cases, and the deference of the Court to any administrative action or conduct claimed to be "necessary to make the securities laws work," must be understood with reference to the grave historical crises caused by the absence of regulation in those industries. The Court has been exceptionally reluctant to allow via the antitrust laws any tampering with the regulatory framework that might threaten the recurrence of similar harm to investors. *See NASD*, 422 U.S. at 705–11, 95 S.Ct. at 2436–38; *Gordon,* 422 U.S. at 681–82, 95 S.Ct. at 2610–11; *Jacobi v. Bache & Co.,* 520 F.2d 1231, 1234 (2d Cir. 1975), *cert. denied*, 423 U.S. 1053, 96 S.Ct. 784, 46 L.Ed.2d 642 (1976). In contrast, potential harms to the public by accommodating regulation to the policy of the antitrust laws in other industries, such as the telephone interconnection industry, has not been well demonstrated. *See* pp. 727–728 & note 33 *infra*.

**32.** The plaintiffs in *Gordon* challenged primarily the practice of the securities exchanges and their members of using fixed rates of commis-

sion for certain kinds of sales. 422 U.S. at 661, 95 S.Ct. at 2601. The Court held that the challenged practices of the exchanges and their members were immune from antitrust attack. *Gordon* does not hold that whenever a federal agency has the authority to approve or prohibit conduct by a regulated entity and is engaged in detailed study of particular conduct, that conduct which occurs during the period of agency study may not be the basis for an antitrust action. Such a situation, without more, does not establish a plain repugnancy between the regulatory scheme and the antitrust laws. *Otter Tail Power Co. v. United States*, 410 U.S. 366, 93 S.Ct. 1022, 35 L.Ed.2d 359 (1973), is precisely contrary and controlling on this issue. *See also* note 31 *supra* (special characteristics of self-regulating securities industry); pp. 727–728 & note 33 *infra* (same).

It is critical here that the pre-*Carterfone* version of Tariff 263 was initiated by the carrier and not the FCC. If the original practice being studied by the agency was not undertaken by the regulated entity to comply with a directive of the agency, and there is no evidence that Congress was either aware of the particular anticompetitive practice or gave the agency specific power to authorize it, we fail to see the relevance of agency study to immunity for anticompetitive injury suffered during the period of agency review. *See also* note 38 *infra* (discussing significance of *Carterfone*).

plied immunity decisions in the context of the industries they govern is well illustrated by *Gordon* and the other securities cases. The securities laws were conspicuously marked from their outset by a reliance on self-regulation. The need to allow a self-regulating industry the freedom to discharge its statutory duties and the inappropriateness of subjecting to antitrust liability the rulemaking and enforcement functions Congress charged the industry with performing decisively shaped the Court's implied immunity analysis in the securities cases.[33]

Several reasons absent from this case combined to support the Court's decision in *Gordon*. The practice of fixed exchange rates at issue in *Gordon* had been explicitly considered by Congress in passing the Securities Exchange Act of 1934. Furthermore, section 19(b) of the Act, 15 U.S.C. § 78s(b) (1976), expressly gave the SEC authority over exchange practices with respect to "the fixing of reasonable rates of commission," notwithstanding Congress' knowledge that this would otherwise be a classic per se antitrust violation. *See Gordon*, 422 U.S. at 664–67, 685, 95 S.Ct. at 2602–2604, 2612. This explicit grant of authority to the SEC, together with Congress' particular awareness of the very price-fixing practices challenged in the antitrust suit, was evidence that Congress intended the Commission's

authority to displace the antitrust laws. A second difference between these appeals and *Gordon* is that the Court held that the SEC's supervision over the practices of the regulated entities was the legal equivalent of "an affirmative order to the exchanges to follow fixed rates." *Id.* at 689 n.13, 95 S.Ct. at 2614.

### B. *NASD*

We also reject defendants' pervasive regulation argument. According to AT&T and General, *NASD* requires that antitrust immunity be implied where the challenged activity is subject to regulation by an agency under a pervasive or comprehensive regulatory scheme, regardless of whether the agency actually exercised its authority to regulate the conduct in question. In *NASD* the Government sought injunctive relief against agreements to fix prices and restrict sales of mutual funds in secondary market transactions between dealers, between investors and dealers, and between investors. 422 U.S. at 701, 95 S.Ct. at 2434. The Government's complaint challenged both vertical (counts II–VIII) and horizontal (count I) anticompetitive activity. *Id.* at 701–02, 95 S.Ct. at 2434. The Court concluded that the vertical restraints were immune from antitrust challenge, but it is critical that the restraints so immunized were explicitly contemplated by statute.[34]

---

33. *See Silver v. New York Stock Exch.*, 373 U.S. 341, 349–57, 83 S.Ct. 1246, 1252–57, 10 L.Ed.2d 389 (1963); *Gordon*, 422 U.S. at 660–82, 95 S.Ct. at 2601–11; *NASD*, 422 U.S. at 720–30, 95 S.Ct. at 2443–48. Justice Stewart concisely described this unusual facet of the securities industry:

> The purpose of the self-regulation provisions of the Securities Exchange Act was to delegate governmental power to working institutions which would undertake, at their own initiative, to enforce compliance with ethical as well as legal standards in a complex and changing industry. This self-initiating process of regulation can work effectively only if the process itself is allowed to operate free from a constant threat of antitrust penalties.

*Silver*, 373 U.S. at 371, 83 S.Ct. at 1264 (Stewart, J., dissenting). *See also* Note, *supra* note 1, 69 Calif.L.Rev. at 513–14.

34. The Court held the vertical restraints immune because of section 22(f) of the Investment Company Act, 15 U.S.C. § 80a–22(f)

(1976), which prohibited restrictions on the transfer of mutual fund shares except as specified in the registration statement, but in any event not "in contravention of such rules and regulations as the [SEC] may prescribe" in the public interest. At the time the lawsuit was begun, the SEC had never exercised its authority under this section to promulgate rules governing transfer of mutual funds shares, although during the lawsuit the SEC indicated it planned to exercise its regulatory authority. 422 U.S. at 718–19 n.31, 95 S.Ct. at 2442 n.31. The Court reasoned:

> [T]he agreements challenged in counts II–VIII are among the kinds of restrictions Congress contemplated when it enacted that section. And this conclusion necessarily leads to a determination that they are immune from liability under the Sherman Act, for we see no way to reconcile the Commission's power to authorize these restrictions with the competing mandate of the antitrust laws. 422 U.S. at 721–22, 95 S.Ct. at 2444.

Count I of the Government's complaint alleged a horizontal conspiracy between NASD and its members to prevent the growth of a secondary dealer or brokerage market for mutual fund shares by means of anticompetitive interpretation and extension of NASD rules. *Id.* The vertical agreements could not have been implemented without some form of concert, *i. e.,* rule-making and rule enforcement. Thus the defendants' horizontal conduct was logically necessary to carry out the legitimate agreements and the sanctioned vertical restraints, if not directly responsive to a regulatory command. Therefore the Court reasoned the concerted activity acquired a kind of derivative immunity by virtue of its relation to the immune restraints implemented by the concerted action.[35]

▮ Antitrust immunity is not conferred by the bare fact that defendants' activities might be controlled by an agency having broad powers over their conduct. There is no general presumption that Congress intends the antitrust laws to be displaced whenever it gives an agency regulatory authority over an industry. Cases prior and subsequent to *NASD* preclude such an expansive immunity doctrine. *See, e. g., Otter Tail Power Co. v. United States,* 410 U.S. 366, 93 S.Ct. 1022, 35 L.Ed.2d 359 (1973). *Cf. Cantor v. Detroit Edison Co.,* 428 U.S. 579, 597, 96 S.Ct. 3110, 3121, 49 L.Ed.2d 1141 (1976) (implied state law exemption). In this respect the area of immunity from antitrust laws is not coterminous with areas of agency jurisdiction or agency expertise. The zones of application of each doctrine in specific cases may be quite different, depending particularly on the specific regulatory history preceding a given lawsuit.

▮ There are several relevant distinctions between *NASD* and these appeals which indicate immunity does not arise in this case. First, as was true in *Gordon,* the *NASD* Court concluded that when Congress passed the controlling securities statutes, it was aware of the challenged anticompetitive practices and intended to permit them unless the SEC determined otherwise. *See* 422 U.S. at 722–28, 95 S.Ct. at 2444–2447. The Court construed the legislative history to mean that Congress intended to give the SEC the exclusive power to disapprove the challenged practices. There is no corresponding legislative history in the case before us. The FCC is not necessarily equipped to police competition in the furnishing of telephone terminal equipment or to enact rules in this regard, other than as necessary to protect the system from damage. Neither congressional mandates nor expressed agency policy leads to any differ-

---

**35.** The Court noted that the theory of the Government's section 1 charge in count I of the complaint was imprecise and obscure. 422 U.S. at 730–31, 95 S.Ct. at 2448. Originally the complaint seemed to attack the establishment and maintenance of the rules and the rules themselves, *id.* at 730–31 n.42, 95 S.Ct. at 2448 n.42; later the focus shifted to the way the defendants enforced and interpreted the rules. In any event, the practices attacked were a logical corollary to some degree of a system of rules designed to prevent a secondary market, and this ultimate goal the Court found clearly sanctioned by the Congress. There is in the case before us no analogous sanction for clearly anticompetitive behavior or for practices in aid of thereof.

The activities in *NASD* were not required or specifically authorized by any particular securities statute, but rather by an integrated scheme of self regulation overseen by the SEC. The issue presented was thus "whether the SEC's exercise of regulatory authority under [the Investment Company Act] and the Maloney Act is sufficiently pervasive to confer an implied immunity." *Id.* at 730, 95 S.Ct. at 2448. The Court noted that under the Maloney Act the SEC must disapprove an Association rule or change in a rule unless it is consistent with the regulatory policies of the Act, *id.* at 732, 95 S.Ct. at 2448, and that the SEC is authorized to require changes in the Association rules. For 35 years the SEC had, in the Court's view, approved the vertical restraints challenged in counts II–VIII. The SEC's authority to regulate the defendants' interpretation and application of these restrictive rules was just as broad as its authority over the initial promulgation of the rules. The Court reasoned: "[W]e can see no meaningful distinction between the Association's rules and the manner in which it construes and implements them. Each is equally a subject of SEC oversight." *Id.* at 733, 95 S.Ct. at 2449. The Court noted that Association rules were subject to careful scrutiny by the SEC, *id.* at 734, 95 S.Ct. at 2450, and concluded that antitrust immunity was necessary to make the regulatory scheme function.

ent conclusion. Second, in both *Gordon* and *NASD* the Court concluded that the SEC had continued to sanction the challenged practice during the period covered by the antitrust complaint as well as many years previously. That crucial factor is conspicuously absent from this case; in fact the contrary is true.[36] Third, the nature of the SEC's regulatory responsibility under the Maloney Act differs decisively from the FCC's responsibility under the FCA. The SEC is required to disapprove any change or addition to an association rule "unless such change or addition appears to be consistent with the requirements of . . . this section." 15 U.S.C. § 78o–3(j) (1970) (now codified in 15 U.S.C. § 78s(b)(2) (1976)). In contrast, the Commission is not required under law to pass any judgment on a proposed tariff, and it does not necessarily approve as agency policy the content of every tariff permitted to go into effect. *MCI Telecommunications Corp. v. FCC*, 561 F.2d 365, 374 (D.C.Cir.1977), *cert. denied*, 434 U.S. 1040, 98 S.Ct. 780, 54 L.Ed.2d 790 (1978); *Associated Press v. FCC*, 448 F.2d 1095 (D.C.Cir.1971). Fourth, in *NASD* the Court found that the practices challenged in

count I were closely related to the activities challenged in counts II–VIII, and the latter were expressly contemplated by the federal statutes. There is no corresponding specific statutory authorization, however, for the allegedly anticompetitive tariffs challenged in this case. *See also MCI Communications Corp. v. American Tel. & Tel. Co.*, 462 F.Supp. 1072, 1094–95 n.27 (N.D.Ill.1978); *Northeastern Tel. Co. v. American Tel. & Tel. Co.*, 477 F.Supp. 251, 257–58 (D.Conn. 1978), *rev'd*, 651 F.2d 76 (2d Cir. 1981). We do not read *NASD* to indicate that the FCA-based immunity is either a logical requirement of that decision or consistent with controlling analytic principles generally.[37]

The most compelling distinction in this case, however, is the *Carterfone* mandate, which may be read not only as precluding a repugnancy argument, but also as precluding an inconsistency argument and affirmatively suggesting that an antitrust remedy is eminently consistent with and complementary to the regulatory scheme.[38] The *Carterfone* decision was itself responsive to a stay in an antitrust case pending in the

---

**36.** *See Hush-A-Phone*, 22 F.C.C. 112 (1957) (after remand). *See also* p. 730 & note 38 *infra.*

**37.** In *Cantor*, decided after *NASD*, the Court reaffirmed that it "has consistently refused to find that regulation gave rise to an implied exemption without first determining that the exemption was necessary in order to make the regulatory Act work, 'and even then only to the minimum extent necessary.'" *Cantor*, 428 U.S. at 597, 96 S.Ct. at 3121 (footnote omitted) (quoting *Silver v. New York Stock Exch.*, 373 U.S. 341, 357, 83 S.Ct. 1246, 1257, 10 L.Ed.2d 389 (1963)).

**38.** *See* note 32 *supra.* As early as 1956, the justification for restricting foreign attachments had been authoritatively construed to be limited to instances of impairment of the telephone system. *See Hush-A-Phone Corp. v. United States*, 238 F.2d 266, 268–69 (D.C.Cir.1956), *after remand*, 22 F.C.C. 112 (1957). This point was reasserted in 1968 in emphatic terms, in the FCC's *Carterfone* decision which preceded the filing of the tariffs at issue here. The Commission there held that a tariff was intrinsically unreasonable if it restricted interconnection for reasons other than actual impairment of the system or its utility to users. The following language is representative of the Commission's directive that carriers be as narrowly specific

in preventing interconnection and as open to customer choice and thereby the competition of foreign attachments as possible:

> [O]ur conclusion here is that a customer desiring to use an interconnecting device to improve the utility to him of both the telephone system and a private radio system should be able to do so, so long as the interconnection does not adversely affect the telephone company's operations or the telephone system's utility for others. A tariff which prevents this is unreasonable; it is also unduly discriminatory when, as here, the telephone company's own interconnecting equipment is approved for use. *The vice of the present tariff, here as in Hush-A-Phone, is that it prohibits the use of harmless as well as harmful devices.*
> . . . .
> There has been no adequate showing that nonharmful interconnection must be prohibited in order to permit the telephone company to carry out its system responsibilities. . . . *We are not holding that the telephone companies may not prevent the use of devices which actually cause harm, or that they may not set up reasonable standards to be met by interconnection devices.*
> . . . The telephone companies would remain free to make improvements to the tele-

federal courts, and the FCC's decision contemplated that the federal court would "pass ultimately upon the antitrust issues after proceedings before the Commission should be concluded." *Carterfone*, 13 F.C. C.2d at 421.

■■■ A regulatory mandate sufficient to confer implied antitrust immunity may in some cases exist in the presence of the following three elements: First, explicit congressional approval of the ultimate anticompetitive effect of the challenged con-

> phone system and could reflect any such improvements in reasonable revised standards for nontelephone company provided devices used in connection with the system. Manufacturers and sellers of such devices would then have the responsibility of offering for sale or use only such equipment as would be in compliance with such revised standards.
> ... *That the telephone companies may not have known prior to the proceedings herein that the Carterfone was in fact harmless is irrelevant, since they barred its use without regard to its effect upon the telephone system.* Furthermore, the tariff was the carrier's own. It was not prescribed by the Commission.... [W]here the carrier itself initiates the rate or practice its lawfulness remains open, not only to a prospective finding but also to a retroactive one.

*Carterfone*, 13 F.C.C.2d at 424–25 (emphasis added).

One further point must be added. We do not accept as significant any argument that the equipment at issue in *Carterfone* was not network control signalling equipment, whereas at least some of the equipment at issue here might be characterized as such. The rule we read in *Carterfone* is that the carriers were put on notice that tariffs might reasonably prohibit only those foreign attachments that posed a significant actual danger to the system. While a tariff might reasonably treat the connection of foreign network signalling equipment differently from the connection of other equipment that was not, this would be simply derivative of the actual danger criterion, in that the former type of equipment alone might pose such a danger. We find no significance to the distinction apart from this criterion, however.

The Commission, as well as this court, has clearly and repeatedly held that while the precise holding of *Carterfone* did not decide the issue of customer replacement of NCSU equipment, the broad and binding principle of *Carterfone*, and *Hush-A-Phone* before it, applied to *all* telephone equipment. As we said in *International Tel. & Tel. Corp. v. General Tel. & Elecs. Corp.*, 518 F.2d 913, 933 (9th Cir. 1975):

> *Carterfone* declared void those tariffs filed with the FCC and state regulatory commissions by all domestic telephone operating companies prohibiting the interconnection of subscriber-owned equipment with the carrier's telephone system. As a result of the *Carterfone* decision, all telephone subscribers are now free, in theory, to buy their own telephone equipment from suppliers of their

> choice. But telephone operating companies have succeeded in minimizing the impact of *Carterfone* through tariffs requiring telephone companies to supply and install interface devices.

(Footnote and citation omitted). We are bound by our previous interpetation of *Carterfone*. *See also First Report*, 56 F.C.C.2d at 594–96 ("our *Carterfone* decision was not limited to the Carterfone device *per se*, but was rather a broad general policy. ... [T]his broad *Carterfone* policy applied equally to devices which had direct electrical connections."); *American Telephone and Telegraph Co.'s Proposed Tariff Revisions in Tariff No. 263 Exempting Mebane Home Telephone Co.*, 53 F.C.C.2d 473, 476–78 (1975) [*Mebane Home Telephone Co.*]:

> The foregoing adequately demonstrates the broad principle underlying *Hush-A-Phone* and *Carterfone*, namely, the subscriber's right to make beneficial use of an interconnected device without causing harm to the telephone company's operations. We see no reason why this broad principle should not extend to interconnected devices such as PBX's and key systems which may replace telephone system equipment. ... The determining factor should be whether there is harm to the telephone network, irrespective of whether the particular interconnection device is one of the nature involved in *Carterfone* or a PBX system or key system. To make a distinction based solely on whether there is a substitution of telephone company equipment, would be an arbitrary and unreasonable infringement of the subscriber's right in the absence of technical harm or other public detriment.

This point was made recently by an FCC hearing examiner:

> The defendant[s'] attempt to limit the broad general policy expressed in *Hush-A-Phone* and *Carterfone* to exclude devices with direct electrical connections must be rejected. There is simply no justification for such a construction. The important and critical factor is whether the device is harmful or harmless, irrespective of whether a direct electrical connection may be involved. More specifically, there was no justification for tariffs which precluded the connection of devices by direct electrical connections which were harmless to the system.

*Western States Tel. Co.*, FCC Docket 16883, slip op. at 58 (Initial Decision of ALJ, released April 10, 1981). *See also* note 20 *supra*.

duct; second, explicit authorization by Congress to an agency or private entity to order the challenged anticompetitive conduct; and third, no inconsistency between the challenged conduct and an express policy of the governing agency. Such a mandate is absent here. Instead of the three elements outlined above, there is clear inconsistency between the challenged conduct and the agency's interpretation of regulatory policy. The case before us does not present the elements that would support a finding of implied immunity under this analysis. To the contrary, we find the *Carterfone* mandate permits freedom of choice to customers and allows system access to competitors and foreign equipment, subject only to restrictions necessary to avoid damage to the telephone network to preserve its utility for the customer.

### C. *Carterfone*

■ Defendants' primary contention is that after the *Carterfone* decision the regulatory agencies put the carriers on the horns of a dilemma: defendants were required to expand opportunities for the use of customer-provided equipment with the nationwide telecommunications network, but at the same time were purportedly charged with ensuring that the increased use of customer-provided equipment would not endanger the safety, reliability, and efficiency of the network. These obligations, they claim, are conflicting and inconsistent unless antitrust immunity is implied; otherwise, the unidimensional focus on competition embodied in the antitrust laws would

conflict with the broader concerns embraced by the public interest standard. Thus, from the regulated entity's viewpoint, a plain repugnancy allegedly exists between the antitrust laws and the Communications Act. While we acknowledge that this argument has some force, we cannot agree that a perceived repugnancy is sufficient to imply immunity—there must be an actual repugnancy between the antitrust laws and the regulatory system. Here, no such actual repugnancy is present; indeed we find the antitrust remedy complementary to the regulatory scheme clarified by *Carterfone*.[39]

■ The concept of plain repugnancy must be examined from both the agency's and the regulated carrier's perspective. The rules for implying antitrust immunity on the basis of regulatory statutes reflect two broad concerns: the agency must have sufficient freedom of action to carry out its regulatory mission, and the regulated entity should not be required to act with reference to inconsistent standards of conduct. *See NASD*, 422 U.S. at 722–25, 95 S.Ct. at 2444–2445; *Gordon*, 422 U.S. at 689, 95 S.Ct. at 2614.[40] In short, the primacy of the regulatory regime must not be threatened, either from the agency's or the regulated entity's viewpoint.

■ According to AT&T, finding no immunity in this case would unfairly subject it to conflicting standards with potential liability for violation of either and would also impair the functioning of the regulatory process.[41] We agree with AT&T that where an actual conflict between the Sher-

---

39. *See* note 38 *supra*.

40. As one student commentator has noted: "One goal implicit in implied immunity analysis is to avoid unfairly subjecting the antitrust defendant to contradictory legal standards, penalizing through the antitrust laws conduct that the regulator in some sense ordered." Note, *Antitrust and Regulated Industries: A Critique and Proposal for Reform of the Implied Immunity Doctrine*, 57 Tex.L.Rev. 751, 824 (1979).

41. Both the antitrust laws and the FCA permit the FCC and the courts to prescribe conduct, through hearings and injunctive relief, respec-

tively, and both laws provide for damages remedies. If a utility adopts a course of conduct seeking to comply with the standards of the FCA, AT&T argues it is more likely to be held liable for treble damages under the antitrust laws; but if the utility adopts Sherman Act standards as its directive and files tariffs designed to maximize competition, AT&T suggests it may be faulted for not heeding the public interest standards of the FCA. We indicate below, however, that these concerns may be assuaged without our finding implied immunity. *See* p. 737 *infra*.

man Act and the FCA exists, the courts should not reconcile the two statutes in such a way that the rational choice for AT&T is to ignore the FCA standards and attempt to comply with the antitrust laws. Thus, for example, where conduct is compelled by the regulatory agency, not implying antitrust immunity would be unfair to the regulated entity and would frustrate agency policies.

█ AT&T argues that the FCC adopted the post-*Carterfone* tariffs when it permitted them to go into effect and that it is entitled to antitrust immunity accordingly.[42] We reject this contention. The FCC does not expressly approve or adopt as agency policy the content of every tariff it permits to become effective. By permitting a tariff to go into effect, the FCC does not assert that it has examined the content of the tariff and found it necessary or appropriate to effectuate the regulatory program, nor does it have an obligation under the Act to make such a finding. *See* 47 U.S.C. § 204 (1976); *MCI Telecommunications Corp. v. FCC*, 561 F.2d 365, 374 (D.C. Cir.1977), *cert. denied*, 434 U.S. 1040, 98 S.Ct. 780, 54 L.Ed.2d 790 (1978); *Associated Press v. FCC*, 448 F.2d 1095 (D.C.Cir.1971). In the instant case, for example, the FCC was explicit in not embracing as agency policy the precise content of the post-*Carterfone* tariffs. It permitted the tariffs to go into effect while the agency conducted its own examination of the interconnection issue, but emphasized that "in doing so we are not giving any specific approval to the revised tariffs." *AT&T "Foreign Attachment" Tariff Revisions*, 15 F.C.C.2d at 610. More particularly, we do not believe the FCC approved the tariff with respect to antitrust considerations or with the kind of endorsement necessary for antitrust immunity.[43]

From the FCC's perspective, applying the antitrust laws in this case involves no conflict between pro-competitive antitrust policies and agency policies. The FCC did not adopt the post-*Carterfone* tariffs as interim agency policy, and it eventually determined that the requirement of a PCA for all interconnections of customer-provided equipment was unreasonable under the public interest standard of the FCA.[44] To permit a court additionally to hold the same conduct unlawful under the Sherman Act does

---

**42.** The issue of agency approval of the post-*Carterfone* tariffs relates not so much to the policy of deference to a regulatory agency as it does to the fairness to the regulated entity. Since the district court decisions in *DASA* and *Phonetele* occurred after the FCC had declared the post-*Carterfone* tariffs unlawful, subsequently permitting an antitrust action for damages does not conflict with an agency policy. *Cf.* Note, *supra* note 40, 57 Tex.L.Rev. at 819–20 (retroactivity of *First Report* bears on issue of fairness, not on issue of conflict giving rise to immunity).

**43.** The majority of courts addressing the issue have concluded that the FCC did not approve the post-*Carterfone* tariffs for purposes of determining antitrust immunity. The district court in *Essential* may be interpreted to hold an opposite conclusion. *See* 446 F.Supp. at 1102, *rev'd*, 610 F.2d 1114 (3d Cir. 1979). The court concluded that "the tariffs were sanctioned as an interim means of protecting the network while the agency developed the necessary data to formulate its registration program." 446 F.Supp. at 1102.

Although the court's factual description of the agency's action may be correct, we cannot agree with its legal conclusions. We have explained our interpretation of the Commission's action on the post-*Carterfone* tariffs above. *See* notes 20 & 38 *supra*. Even if the FCC's positions during the 1968–1975 period was ambiguous in some respects, however, *see, e. g., AT&T "Foreign Attachment" Tariff Revisions*, 18 F.C.C.2d at 872 (on reconsideration), the FCC cannot reasonably be interpreted as having adopted the post-*Carterfone* tariffs as agency policy for purposes of determining antitrust immunity. *See also Northeastern*, 477 F.Supp. at 259–60.

In any event, the district court in *Essential* was reversed. *Essential Communications Sys., Inc. v. American Tel. & Tel. Co.*, 610 F.2d 1114 (3d Cir. 1979).

**44.** In a related lawsuit, the FCC has indicated that conduct which it has prescribed or explicitly approved should be entitled to antitrust immunity, but there should be no "blanket immunity" for all conduct embodied in tariffs filed with the FCC and permitted to go into effect. *Memorandum of FCC as Amicus Curiae, reprinted in* 62 F.C.C.2d 1103 (1975). *See United States v. American Tel. & Tel. Co.*, 427 F.Supp. 57, 59 (D.D.C.1976).

not jeopardize any policy adopted by the agency.[45]

The final point of AT&T's and General's plain repugnancy argument is grounded in the remedial structure of the FCA. They contend that the Act provides a complete and self-contained remedial scheme, including availability of damages, for violations of the public interest standard. We note this involves a number of suppositions. First we are asked to find an implied legislative intention to award damages to competitors for competitive injury specifically, and we are asked to make the further inference that the assumed remedy was impliedly intended to displace the antitrust laws. Potential liability for violation of the FCA also is part of AT&T's contention that it is subject to sanctions under conflicting substantive standards.

Although we think the assertion that damages are available to competitors under the FCA is open to question,[46] the existence of the remedy would not dictate

---

**45.** By contrast, if a plaintiff sued AT&T under the Sherman Act for damages or injunctive relief based on AT&T's implementing the registration program on file with the FCC, such a suit probably would conflict with a considered policy adopted by the FCC. To allow the antitrust action to frustrate the goals of the FCA as defined by the FCC in the registration program would, in the agency's view, involve a plain repugnancy and require antitrust immunity. Cf. *Mt. Hood Stages, Inc. v. Greyhound Corp.*, 555 F.2d 687, 692–93 (9th Cir. 1977) (in context of state regulation), *cert. denied in part*, 434 U.S. 1008, 98 S.Ct. 716, 54 L.Ed.2d 750, *vacated on other grounds*, 437 U.S. 322, 98 S.Ct. 2370, 57 L.Ed.2d 239 (1978); *Note, supra* note 40, 57 Tex.L.Rev. at 793.

**46.** The Third Circuit in *Essential Communications Sys., Inc. v. American Tel. & Tel. Co.*, 610 F.2d 1114 (3d Cir. 1979), held in a similar case that immunity was inappropriate because the plaintiff was a competitor and not a customer of AT&T. The court concluded that the FCA was intended to protect customers of carriers against discriminatory rates and charges but was not designed to regulate the conduct of carriers vis-a-vis competitors. We have some doubt regarding the court's interpretation of the Act's history. Competitors of AT&T have initiated and participated in numerous proceedings before the FCC. *See, e. g., Comtronics, Inc.*, 57 F.C.C.2d 1202 (1976); *Computoll Corp.*, 56 F.C.C.2d 35 (1975); *American Tel. & Tel. Co.*, 56 F.C.C.2d 14 (1975); *United Tel. Co. of the Carolinas*, 52 F.C.C.2d 717 (1975); *CPI Microwave, Inc.*, 52 F.C.C.2d 173 (1975).

In a similar vein, several courts, on somewhat different rationales and with varying degrees of analysis, have indicated their doubt concerning the availability or effectiveness of the damages remedy when a competitor sues a regulated entity for violation of the FCA. *See, e. g., Mid-Texas*, 615 F.2d at 1380 ("[T]he FCC [is not] empowered to award damages in favor of [an] injured competitor" for violation of FCA); *Nader v. FCC*, 520 F.2d 182, 206 (D.C. Cir.1975) (remedial system incomplete; no damages remedy for competitors) (dicta) (by implication); *Litton Sys., Inc. v. American Tel.*

& *Tel. Co.*, 487 F.Supp. 942 (S.D.N.Y.1980) (damages remedy more useful in theory than practice); *MCI Communications Corp. v. AT&T*, 462 F.Supp. 1072, 1088 (N.D.Ill.1978) (no damages remedy under FCA for injury suffered by competitor) (dicta); *United States v. American Tel. & Tel. Co.*, 461 F.Supp. 1314, 1328 n.43 (D.D.C.1978); *Essential*, 446 F.Supp. at 1100–02 (FCC's *First Report* not retroactive). *But see Phonetele*, 435 F.Supp. at 213.

Perhaps an authoritative answer to this question is on the horizon. A hearing examiner has awarded damages to a competitor of AT&T for conduct similar to that alleged here. *Western States Tel. Co.*, FCC Docket No. 16883 (Initial Decision of ALJ, released April 13, 1981). It remains to be seen whether the Commission and the courts sustain the award.

Even if we were to accept that competitors had recourse to a remedial scheme under the FCA, and even were we further to accept that there might be different substantive standards, this would fall far short of a showing that the two remedies would be inconsistent. The law is full of instances of conduct that might give rise to two different types of liability, claims, or causes of action, and the difference is not thought synonymous with inconsistency. As even the predicates of this argument are dubious, we will not speculate at length about theoretical conflicts in a remedial vacuum.

There are two reasons for this. First, the Initial Decision in *Western States Telephone* indicates that the standard for any liability would not be inconsistent with straight antitrust analysis, though of course the damages are not trebled. *Id.* at 62–70. Second, the freedom of a party injured by anticompetitive conduct to elect between an administrative FCA remedy and a judicial cause of action under the Clayton Act is quite acceptable; the latter need not derogate or interfere with the former:

Petitioner's failure to seek Shipping Act reparations does not affect its rights under the antitrust laws. The rights which petitioner claims under the antitrust laws are entirely collateral to those which petitioner might have sought under the Shipping Act. This

immunity from the antitrust laws in any event.[47] First, the mere existence of a damages remedy within the Act does not indicate a congressional intent to displace the antitrust laws. The extent of the remedy differs significantly from the reach of the antitrust laws, so it is more probable Congress meant to supplement rather than displace the antitrust laws.[48]

■■■ AT&T's argument that the FCA's possible damages remedy and the antitrust laws subject it to conflicting substantive standards is nothing more than a restatement of its principal contention, already discussed above. To the extent the carrier's conduct violates the FCA, those actions were neither compelled by the FCC nor adopted as agency policy. Such conduct should be and is subject to antitrust scrutiny since it is the product of the regulated entity's independent initiative and judg-

ment.[49] Conduct is exempt from the antitrust laws only when the regulated entity is required to pursue a particular course of action to comply with an identifiable and specific mandate of the regulatory statute.

We believe that this discussion of immunity applies with equal force to Phonetele's allegations of harmful ancillary practices by AT&T.[50]

### D. *State Regulation*

■■■ DASA's complaint is based principally on General's filing of a state tariff conforming to the amended No. 263. Some of the matters pleaded in the complaint, such as the rates charged in connection with the PCAs, appear to be entirely regulated by the CPUC. Prior to 1974, state commissions had broad authority to regulate interconnection practices.[51] General has not specifically argued that the state action exemption applies to the facts of this case,

---

does not suggest that petitioner might have sought recovery under both, but petitioner did have its choice. *Carnation Co. v. Pacific Westbound Conference*, 383 U.S. 213, 224, 86 S.Ct. 781, 787, 15 L.Ed.2d 709 (1966).

47. We do note that under some interpretations of the rule of reason, the absence of a damages remedy under the FCA weighs against finding an implied antitrust immunity and gives the antitrust court a role in enforcing the public interest standards of the Act. *See Mid-Texas*, 615 F.2d at 1380.

48. A contrary interpretation might lead to the conclusion that any explicit damages remedy within a regulatory act, whether or not focused solely on antitrust violations, would give rise to antitrust immunity. We refuse, however, to rely so heavily on such a thin reed especially in light of Supreme Court precedents and the Court's repeated admonitions that repeal of the antitrust laws is not to be lightly inferred. *See, e. g., Carnation*, 383 U.S. at 224, 86 S.Ct. at 787 (petitioner had option of seeking recovery under either Shipping Act or antitrust laws). It is unlikely that a plaintiff could recover damages under both statutes, *see id.*, so there is no danger of multiple liability.

49. *Cf. Cantor*, 428 U.S. at 594, 96 S.Ct. at 3119 ("nothing unjust in a conclusion that . . . [defendant's] participation in the decision is sufficiently significant to require that its conduct implementing the decision . . . conform to applicable federal law"); *Northeastern*, 477 F.Supp. at 263 (defendant initiated challenged practice "not at the command of the state, but

after exercising its own business judgment"); *United States v. American Tel. & Tel. Co.*, 461 F.Supp. 1314, 1327–28 (D.D.C.1978):

The allegations of the complaint describe conduct that quite obviously was not stimulated by regulatory supervision or coercion; it is of a character that reflects defendants' business judgment that its profits might be maximized if potential customers were discouraged from entering the various markets AT&T controls.

50. Phonetele's complaint pleaded several matters ancillary to the tariff: It was alleged that AT&T delayed the availability of connecting arrangements for consumers outside California for over three years and charged consumers outside California over three times the monthly service charge for the same service within California without justification. Finally, Phonetele alleged that AT&T deliberately misinterpreted its own tariffs when it required a PCA for the Phonemaster. According to Phonetele, tariff 263 did not cover the Phonemaster. *See* p. 721 and notes 5 & 6 *supra*.

Regarding immunity for the ancillary conduct, the FCC may have primary jurisdiction to hear complaints concerning alleged misinterpretation or bad faith implementation of filed tariffs, but we have already concluded that this fact alone does not require implied antitrust immunity.

51. This changed after *Telerent. See* p. 723 & notes 13, 14, 22 *supra*. Even after 1974, state commissions still retained authority to regulate the rates charged in connection with

although it has argued that state regulatory activity should be judged under the same standards as FCC regulation, since the state regulation is itself a federal policy of the Communications Act. Irrespective of the standard we apply, state action exemption or federal immunity, the result is identical: the challenged conduct is subject to antitrust scrutiny. To the extent federal policy embraces state regulatory activity, the foregoing discussion is applicable, *see* pp. 723–750 *supra,* and immunity from the antitrust laws will not be implied. As the following analysis indicates, moreover, the possibility of immunity based on *Parker v. Brown,* 317 U.S. 341, 63 S.Ct. 307, 87 L.Ed. 315 (1943), is similarly foreclosed.

The most recent Supreme Court decision analyzing the scope of the state-action exemption is *California Retail Liquor Dealers Ass'n v. Midcal Aluminum, Inc.,* 445 U.S. 97, 100 S.Ct. 937, 63 L.Ed.2d 233 (1980). There, in reaffirming its earlier precedents in this area, the Court distilled from those prior decisions two requirements necessary to obtain immunity under *Parker v. Brown* : (1) the challenged restraint must be clearly articulated and affirmatively expressed as state policy; and (2) that policy must be actively supervised by the state itself. 445 U.S. at 105, 100 S.Ct. at 943. *See also*

*New Motor Vehicle Bd. v. Orrin W. Fox Co.,* 439 U.S. 96, 99 S.Ct. 403, 58 L.Ed.2d 361 (1978); *City of Lafayette v. Louisiana Power & Light Co.,* 435 U.S. 389, 98 S.Ct. 1123, 55 L.Ed.2d 364 (1978).[52] The Court has clearly stated that "state authorization, approval, encouragement, or participation in restrictive private conduct confers no antitrust immunity." *Cantor,* 428 U.S. at 592–93, 96 S.Ct. at 3118 (footnotes omitted).[53]

In light of the foregoing principles, we conclude that the CPUC never embraced the PCA tariff in such a way as to make antitrust immunity appropriate.[54] The CPUC did not strike down the PCA tariff when it was filed by General, but this fact alone is insufficient to confer *Parker* immunity. *See, e. g., Cantor,* 428 U.S. at 592–93, 96 S.Ct. at 3118; *Goldfarb v. Virginia State Bar,* 421 U.S. 773, 790–91, 95 S.Ct. 2004, 2014–15, 44 L.Ed.2d 572 (1975).

We do not think the oversight exercised by the CPUC prior to announcement of its registration program constituted clear evidence of an active state policy to displace competition in the area of customer-provided equipment.[55] The CPUC did order General to permit connection of the Divert-A-Call subject to agreement on safety measures, and in late 1973 the CPUC began an

---

customer-provided equipment, and one of the antitrust allegations is that General charged excessive prices, reflected in filed tariffs, in an effort to monopolize the relevant markets.

**52.** In this vein, the Court has already held that antitrust immunity should not be conferred when a state agency passively accepts a public utility's tariff. *See Midcal,* 445 U.S. at 104, 100 S.Ct. at 942. *Cf. Cantor v. Detroit Edison Co.,* 428 U.S. 579, 96 S.Ct. 3110, 49 L.Ed.2d 1141 (1976) (implied state action). As the Court explained in *Goldfarb v. Virginia State Bar,* 421 U.S. 773, 791, 95 S.Ct. 2004, 2015, 44 L.Ed.2d 572 (1975), "[i]t is not enough that . . . anticompetitive conduct is 'prompted' by state action; rather, anticompetitive activities must be compelled by direction of the State acting as a sovereign."

**53.** *Cf. Bates v. State Bar of Arizona,* 433 U.S. 350, 97 S.Ct. 2691, 53 L.Ed.2d 810 (1977) (state action exemption); *Goldfarb v. Virginia State Bar,* 421 U.S. 773, 95 S.Ct. 2004, 44 L.Ed.2d 572 (1975) (same). This is especially the case where the entity claiming the benefit of the state action exemption is not a public corpora-

tion, such as a municipally owned utility, but is a private enterprise subject to state regulation. *See City of Lafayette v. Louisiana Power & Light Co.,* 435 U.S. 389, 98 S.Ct. 1123, 55 L.Ed.2d 364 (1978).

**54.** Other courts which have refused to imply antitrust immunity under the FCA for the activities of AT&T have also held those activities, and parallel measures taken before state utilities commissions, unprotected by the *Parker* doctrine. *See, e. g., Mid-Texas,* 615 F.2d at 1380–81; *Essential,* 610 F.2d at 1125; *Litton Systems,* 487 F.Supp. at 955–57.

**55.** *But see Jeffrey v. Southwestern Bell,* 518 F.2d 1129, 1133 (5th Cir. 1975) (rate approval by city council held sufficiently "sovereign"). Whatever degree of state sanction beyond mere authorization or approval is required by the Supreme Court's cases, *cf. Cantor,* 428 U.S. at 592–93, 96 S.Ct. at 3118 (state action exemption); *Goldfarb,* 421 U.S. at 790, 95 S.Ct. at 2015 (same), the CPUC did not adopt or embrace the PCA requirement as state policy beyond the mere fact of permitting General to file

investigation into interconnection practices. As with regulation by the FCC, however, a competitor may sue for damages based on conduct which occurred before the agency adopted any policy on interconnection of foreign attachments, since a decision in such a suit, rendered after disapproval by the agency, could not threaten to disrupt a considered policy of the CPUC.[56]

## IV. ANTITRUST LIABILITY AND THE SIGNIFICANCE OF REGULATION

 Our holding that appellees have no immunity does not mean that we disregard their status as a regulated common carrier. That status is relevant; it is a "fact of market life."[57] While a given regulatory scheme may not amount to the degree of necessity required to confer implied immunity on all activities of a regulated entity, some degree of necessity may be established as a matter of fact in individual cases. When the regulated entity assertedly attempts to respond to its duties as a common carrier by filing and implementing an anticompetitive tariff, the antitrust laws do not apply to the tariff without regard to the technical and legal constraints flowing from the regulatory structure. If a defendant can establish that, at the time the various anticompetitive acts alleged here were taken, it had a reasonable basis to conclude

the tariff containing the PCA requirement. Thus, the first requirement of *Midcal* is not met in this case.

We do recognize a possible distinction between this case and *Cantor*, in that the CPUC's concern over the safety of the telephone network and its corresponding power to regulate the conditions of interconnection, as well as its concern with rates charged in connection with customer-provided equipment, are at the core of its regulatory concerns, *see* I P. Areeda & D. Turner, Antitrust Law ¶ 214b4 (1978), whereas provision of light bulbs in *Cantor* did not relate to the central purpose of the regulatory agency. We do not mean to suggest that *Parker* immunity never applies to tariffs initiated by the regulated entity. *See* I P. Areeda & D. Turner, *supra,* at ¶¶ 212–15. The CPUC did not, however, express its concern or exercise its power in such a way as to provide immunity for General's conduct.

Professors Areeda and Turner have concluded, albeit "reluctantly," that where there is adequate supervision and clear state intent, regulation of foreign attachments to the telephone system by state utilities commissions probably should be immune from antitrust attack. *See id.* ¶¶ 214b4 & 215b2, at 86–87, 96. This conclusion would appear to apply equally to regulation by state commissions and also federal commissions such as the FCC. We agree with Professors Areeda and Turner on this issue, but we do not think that our holding will "render inoperable the regulatory programs of most states." *Id.* ¶ 215b2, at 96. We hold only that neither the FCC nor the CPUC intended to adopt the content of the post-*Carterfone* tariffs as federal or state policy, respectively, when they permitted the tariffs to go into effect.

**56.** It is possible, however, that General may be entitled to antitrust immunity on another ground. Supreme Court and lower court decisions indicate that a defendant's freedom of choice in taking the allegedly anticompetitive action is an important factor in determining whether implied regulatory immunity or immunity under the state action exemption is appropriate. *Cf. Cantor,* 428 U.S. at 592–93, 96 S.Ct. at 3118 (state action question); *Goldfarb,* 421 U.S. at 790, 95 S.Ct. at 2015. As we noted earlier in this opinion, when the facilities of an intrastate telephone company are used for interstate communications, they are subject to the tariffs filed by AT&T. To the extent General's decision to require a protective connecting arrangement was dictated by AT&T's tariff revisions filed with the FCC, its own PCA tariff may have been a justified, if not a coerced, compliance with the requirements of the federal and state regulatory schemes. *See* p. 723 & note 14 *supra* (relation between federal and state regulatory schemes); pp. 737–741 *infra* (dictates of regulatory scheme under which defendant operates may be used to establish a factual defense in particular cases).

**57.** *International Tel. & Tel. Co. v. General Tel. & Elecs. Corp.,* 518 F.2d 913, 935–36 (9th Cir. 1975) (footnote omitted). *See also Otter Tail Power Co. v. United States,* 410 U.S. 366, 381–82, 93 S.Ct. 1022, 1031, 35 L.Ed.2d 359 (1973):

We do not suggest, however, that the District Court, concluding that Otter Tail violated the antitrust laws, should be impervious to Otter Tail's assertion that compulsory interconnection or wheeling will erode its integrated system and threaten its capacity to serve adequately the public.... Since the District Court has made future connections subject to Commission approval and in any event has retained jurisdiction to enable the parties to apply for "necessary or appropriate" relief and presumably will give effect to the policies embodied in the Federal Power Act, we cannot say under these circumstances that it has abused its discretion.

that its actions were necessitated by concrete factual imperatives recognized as legitimate by the regulatory authority, then its actions did not violate the antitrust laws. At this stage of the proceedings, it appears this inquiry will depend largely on whether the facts show the companies did reasonably conclude, given their expertise, that uncontrolled NCSU interconnection would endanger their own equipment or disrupt their own signal transmissions in identifiable ways, and also that the tariff as filed was a reasonable, properly focused mechanism, considering other alternatives then available, to prevent such real harm from occurring.[58] These matters must be developed at trial.

These factual justifications, the resolution of which is necessarily open at this point, are to be distinguished from the various legal issues in the case which we now foreclose. The defendants may not justify their actions based on some mistake of law in interpreting the FCA, or judicial or FCC decisions. It will not be open to a defendant to argue that it was entitled as a matter of right to file any tariff it chose or that it was obliged to file a tariff absent the kind of factual necessities we have outlined above.[59] After the *Carterfone* decision, a

defendant may not assert that it was entitled by law or agency policy to a monopoly in the furnishing and supply of terminal equipment.

The defense outlined above, the justification of regulatory necessity, must be established in the context of the specific claims made out in the pleadings.

### A. *Tying Claims*

Phonetele alleges that AT&T violated section 3 of the Clayton Act, apparently by tying AT&T customers to acceptance of AT&T's interconnecting devices. Tying can constitute a per se violation of both section 3 of the Clayton Act and section 1 of the Sherman Act. *See Moore v. Jas. H. Matthews & Co.*, 550 F.2d 1207, 1211–13 (9th Cir. 1977). Conduct that does not meet the requirements of either per se rule, however, may still constitute a violation of the section 1 rule of reason. *Fortner Enterprises, Inc. v. United States Steel Corp.*, 394 U.S. 495, 500, 89 S.Ct. 1252, 1257, 22 L.Ed.2d 495 (1969). *See United States Steel Corp. v. Fortner Enterprises, Inc.*, 429 U.S. 610, 612 n.1, 97 S.Ct. 861, 863 n.1, 51 L.Ed.2d 80 (1977).

The tying per se rule is exceptional in that it permits the defendant to

**58.** The defendants might, for example, attempt to demonstrate why methods of protecting the system which did not depend on particularized knowledge about the technical specifications of all types of equipment that might be interconnected, would have been either inadequate or not reasonably foreseeable. One such method is suggested by the FCC-proposed tariff in 1975, namely the requirement that those desiring to connect foreign equipment first notify the telephone company with the provision that the telephone company could temporarily discontinue service to any customer whose equipment was causing actual harm to the telephone network. *See First Report*, 56 F.C.C.2d at 611–12.

**59.** Counsel for General assert that in *Carterfone* "[t]he FCC *ordered* the telephone companies to submit new tariffs [to protect the telephone system]" (emphasis added). The words of the Commission are at no point in the decision ambiguous as to this issue and simply will not bear this interpretation:

In view of the unlawfulness of the tariff there would be no point in merely declaring it invalid as applied to the Carterfone and permitting it to continue in operation as to other

interconnection devices. This would also put a clearly improper burden upon the manufacturers and users of other devices. *The appropriate remedy is to* strike the tariffs and *permit the carriers, if they so desire, to propose new tariff provisions* in accordance with this opinion. We make no rulings as to damages since that relief has not been requested. As noted above, *the carriers may submit new tariffs* which will protect the telephone system against harmful devices, *and may specify technical standards if they wish.*

*Carterfone*, 13 F.C.C.2d at 425–26 (footnote omitted) (emphasis added).

The *Carterfone* decision offered AT&T a choice between action and inaction. In our view, section 203 of the FCA does not require a carrier to file a tariff describing an omission to act. Even if such a statutory requirement had existed, the mere compulsion to file a descriptive tariff would not in any way have justified the filing of a restrictive tariff. The defendants do not argue that they were compelled to resist interconnection by the possibility of liability for any damage caused by uncontrolled interconnection. *See* pp. 741–742 & note 64 *infra* (discussing *Mid-Texas*).

offer justifications for undertaking the tie. Baker, *The Supreme Court and the Per Se Tying Rule: Cutting the Gordian Knot*, 66 Va.L.Rev. 1235, 1250 (1980). *See, e. g., Moore*, 550 F.2d at 1217. A tie-in may be justified if implemented for a legitimate purpose and if no less restrictive alternative is available. *Siegel v. Chicken Delight, Inc.*, 448 F.2d 43, 51 (9th Cir. 1971), *cert. denied*, 405 U.S. 955, 92 S.Ct. 1172, 31 L.Ed.2d 232 (1972); *see, e. g., United States v. Jerrold Elecs. Corp.*, 187 F.Supp. 545, 557, 560–61 (E.D.Pa.1960), *aff'd per curiam*, 365 U.S. 567, 81 S.Ct. 755, 5 L.Ed.2d 806 (1961). The defendant, however, has the burden of showing that the tie-in was reasonable for the entire time it was in effect. *See Jerrold Elecs. Corp.*, 187 F.Supp. at 558. If a regulated entity in this case can establish a defense consistent with the outline set out above, it will then have a justification which is a defense to the illegal tying charge.[60]

### B. *Violations of Section 2 of the Sherman Act*

■■■ Both plaintiffs allege that defendants have monopolized in violation of section 2 of the Sherman Act. In general, a section 2 claim requires two principal elements in addition to antitrust injury: (1) possession of monopoly power in the relevant market and (2) willful acquisition or maintenance of that power. *Hunt-Wesson Foods, Inc. v. Ragu Foods, Inc.*, 627 F.2d 919, 924 (9th Cir. 1980), *cert. denied*, 450 U.S. 921, 101 S.Ct. 1369, 67 L.Ed.2d 348 (1981); *California Computer Prods. v. International Business Machs. Corp.*, 613 F.2d 727, 735 (9th Cir. 1979). A monopolist may not invidiously use its power in one market, even if lawfully obtained, to harm competition in another market. *See Pacific Coast Agricultural Export Ass'n v. Sunkist Growers, Inc.*, 526 F.2d 1196 (9th Cir. 1975), *cert. denied*, 425 U.S. 959, 96 S.Ct. 1741, 48 L.Ed.2d 204 (1976). Although regulation in certain instances has been considered in determining if monopoly power exists,[61] we need not consider this issue at present. Rather, we are concerned with the conduct element of the monopolization claim.

■■■ Willful acquisition or maintenance means that the monopolist must have "engaged in 'willful' acts directed at estab-

---

**60.** This court in *Moore* rejected a claim for immunity based on state regulation, but it is not clear from the *Moore* opinion precisely what argument the panel rejected. The briefs in that case reveal that the defendants-appellees argued only that an Oregon statute which authorized, but did not require, cemeteries to promulgate rules in very general terms could be interpreted to cover the challenged tying practices. *Moore* is distinguishable on this point because the defendants-appellees in that case offered a conjectural and wholly state law ground as a justification. Here we are dealing with a state regulation that is in many ways an appendage of the dominant federal regulatory program. We are also not permitting conclusory assertions of conjectural regulatory justification, as in *Moore*, but are only allowing an opportunity to prove a narrowly defined type of regulatory necessity as a concrete matter of fact.

Finally, we think dictum in the *Cantor* opinion, on which the *Moore* panel relied heavily, strongly supports our view. After acknowledging the severe penalty of the treble-damages provision of the antitrust laws, the Court stated:

> The concern about treble-damage liability has arguable relevance to this case in two ways. If the hazard of violating the antitrust laws were enhanced by the fact of regulation, or if a regulated company had engaged in anticompetitive conduct in reliance on a justified understanding that such conduct was immune from the antitrust laws, a concern with the punitive aspects of the treble-damage remedy would be appropriate. But neither of those circumstances is present in this case.

428 U.S. at 599, 96 S.Ct. at 3121. Thus, were the Court to encounter a case presenting a justifiable reliance on the perceived dictates of a state or federal regulatory scheme, some measure of relief from the antitrust laws would probably result. We have decided that such relief should be incorporated into the standard of antitrust liability.

**61.** *See, e. g., Travelers Ins. Co. v. Blue Cross of W. Pa.*, 361 F.Supp. 774, 780 (W.D.Pa.1972), *aff'd*, 481 F.2d 80 (3d Cir.), *cert. denied*, 414 U.S. 1093, 94 S.Ct. 724, 38 L.Ed.2d 550 (1973). *Cf. International Rys. of Cent. America v. United Brands Co.*, 532 F.2d 231, 240 (2d Cir.), *cert. denied*, 429 U.S. 835, 97 S.Ct. 101, 50 L.Ed.2d 100 (1976) (consent decree had eliminated "monopolist's" power to control prices).

lishing or retaining its monopoly, 'as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident.' " *California Computer Prods.*, 613 F.2d at 735 (quoting *United States v. Grinnell Corp.*, 384 U.S. 563, 571, 86 S.Ct. 1698, 1704, 16 L.Ed.2d 778 (1966)). The defendants here may protect themselves against a charge of willful monopolistic conduct by the same showing of a reasonable response to factual imperatives affecting a regulated common carrier that are applicable to the tying charge. *See Mid-Texas Communications Sys., Inc. v. American Tel. & Tel. Co.*, 615 F.2d 1372, 1389–90 (5th Cir.), *cert. denied*, 449 U.S. 912, 101 S.Ct. 286, 66 L.Ed.2d 140 (1980); Watson & Brunner, *Monopolization by Regulated "Monopolies": The Search for Substantive Standards*, 22 Antitrust Bull. 559, 577–79 (1977). Similarly, in the absence of a direct showing of a specific intent to monopolize in support of any section 2 attempt or conspiracy claims, *see* Watson & Brunner, *supra*, at 583 n.23, the defendants may attempt to rebut an anticompetitive characterization of their conduct, *see generally California Computer Prods.*, 613 F.2d at 737, by the identical showing of reasonable conduct as a regulated carrier, *see id.; Sherman v. British Leyland Motors, Ltd.*, 601 F.2d 429, 453 n.47 (9th Cir. 1979).

### C. *Violations of Section 1 of the Sherman Act*

In response to the allegations of section 1 rule of reason violations in this case, defendants may offer their showing of reasonable conduct to rebut plaintiffs' evidence to the contrary. Should claims of section 1 per se violations other than tying be made,

the defendants may respond by offering the same justification applicable to the tying claims.

### D. *Conclusion: Regulatory Constraints as a Defense to Antitrust Claims*

As noted in the preceding sections, regulatory and operating constraints imposed on the defendants may be taken into account in ascertaining liability for the section 1, section 2, and tying allegations. That conclusion finds support in both caselaw and commentary. In *Silver v. New York Stock Exch.*, 373 U.S. 341, 360–61, 365, 83 S.Ct. 1246, 1258–59, 1261, 10 L.Ed.2d 389 (1963), the Court was confronted with a challenge to the New York Stock Exchange's requirement that its members remove private direct telephone wires which had enabled a non-member broker/dealer to communicate directly with the trading desks of member firms. Although the Court refused to find antitrust immunity for exchange self-regulation, *id.* at 360–61, 83 S.Ct. at 1258–59, it nonetheless indicated that it was prepared to permit the "interposing of a substantive justification" for challenged conduct which, but for the regulatory setting, would have been deemed per se illegal. *Id.*[62]

*Jacobi v. Bache & Co.*, 520 F.2d 1231 (2d Cir. 1975), *cert. denied*, 423 U.S. 1053, 96 S.Ct. 784, 46 L.Ed.2d 642 (1976), also involved rejection of an immunity defense and the creation of a mechanism permitting the antitrust court to evaluate the impact of a regulatory scheme in a per se context. The *Jacobi* court's analysis of the evidence presented at trial indicates its view that a standard of objective reasonableness was appropriate for examination of a stock ex-

---

**62.** The Court found the requirement completely unjustifiable and struck it as violative of the Sherman Act mainly due to the lack of procedural safeguards accompanying the deprivation of the private wire service. 373 U.S at 361, 83 S.Ct. at 1259.

Similarly, in *United States v. Marine Bancorporation, Inc.*, 418 U.S. 602, 94 S.Ct. 2856, 41 L.Ed.2d 978 (1974), the Government challenged under section 7 of the Clayton Act a merger

between two banks based on the potential competition doctrine. Noting the "extensive federal and state regulatory barriers to entry into commercial banking," the Court specifically held that "the application of the [potential competition] doctrine to commercial banking must take into account the unique federal and state regulatory restraints on entry into that line of commerce." *Id.* at 627–28, 94 S.Ct. at 2872–2873 (footnote omitted).

change rule challenged as price-fixing.[63] *See id.* at 1239.

The Fifth Circuit, in *Mid-Texas Communications Sys., Inc. v. American Tel. & Tel. Co.,* 615 F.2d 1372 (5th Cir.), *cert. denied,* 449 U.S. 912, 101 S.Ct. 286, 66 L.Ed.2d 140 (1980), contemplated a request for implied immunity from a non per se claim. It held, in a case analogous to these consolidated cases, that section 201(a) of the FCA imposed a duty on Southern Bell Telephone Co. (Bell) to resist requests for interconnection of local independent telephone companies when it perceived those requests were not in the public interest.[64] Although unwilling to accord Bell antitrust immunity for its refusal to interconnect an applicant who wished to provide local phone service that Bell also wished to provide, the court granted Bell a new trial, recognizing that "to the extent that [Bell] based its decision ... on articulable concerns relating to the public interest as defined in [the

**63.** The *Jacobi* case dealt with self-regulation by the New York Stock Exchange, under the Securities Exchange Act. We are aware that the *Jacobi* panel relied on *Silver,* and placed on the plaintiff the burden of showing that the challenged conduct of the regulated entity was neither "germane" to the purposes of the Securities Exchange Act nor consistent with reason. *See* 520 F.2d at 1239. The *Silver* Court, however, did not go so far as to detail what standard of proof might be applied to a proferred regulatory defense and where the burden of proof might lie. *See* 373 U.S. at 366, 83 S.Ct. at 1261.

While the *Silver* Court located its action under the "aegis of the rule of reason," *id.* at 360, 83 S.Ct. at 1258, it also spoke of a regulatory justification "in answer to the assertion of an antitrust claim," *id.* at 361, 83 S.Ct. at 1259, and of the "interposing" of such a justification, *id.* at 366, 83 S.Ct. at 1261. Thus, although we agree with the Second Circuit's choice of a standard of reasonableness, we read *Silver* to imply that the burden of maintaining a regulatory justification lies on the defendant. We think this allocation of the burden (1) minimizes the distortion of the elements of substantive antitrust violations that would result were we to attempt to apply a "rule of reason" analysis beyond the scope of section 1 and (2) places the burden of production on the party with the best access to evidence and expertise. Accordingly, our allocation is consistent with our desire to avoid undue interference with plaintiffs' exercise of their right to seek the protection of the "fundamental national economic policy" represented by the antitrust laws, *see National Geri-medical Hospital v. Blue Cross,* 452 U.S. 378, 390, 101 S.Ct. 2415, 2422, 69 L.Ed.2d 89 (1981), (quoting *Otter Tail Power Co. v. United States,* 410 U.S. 366, 374, 93 S.Ct. 1022, 1028, 35 L.Ed.2d 359 (1973)), while accommodating fairness by permitting regulated entities "breathing space" between the dictates of the regulatory regime and the antitrust laws. *See Silver,* 373 U.S. at 360, 83 S.Ct. at 1258.

The Initial Decision in *Western States Telephone* makes a similar point:

Contrary to the arguments of the telephone company defendants, the burden of establishing that the Western States telephones were harmful to the telephone system was on the defendants. In this connection, the Commission made clear in Docket 19528 *First Report and Order,* 56 FCC 2d 593, 596 that the *Carterfone* decision "placed the burden of proof squarely upon the carriers—not the users or this Commission—to demonstrate that a particular unit or class of customer-provided equipment would cause either technical or economic harm to the telephone network...." Thus, while the designation order in this case placed the burden of proof on the question of damages on Western States, the order placed the question of harm from interconnected equipment on the carrier. (See 62 FCC 2d 1070, 1071 (1977)). Hence, defendants' arguments to the contrary are rejected. It appears clear that the defendants were in the best position to establish either the presence or absence of harm arising from the Western States telephones. They had access to the information pertinent to a resolution of such question. *Resale and Shared Use of Common Carrier Services and Facilities,* 60 FCC 2d 261, 284–285 (1966). *Referral of Chastain v. AT&T,* 49 FCC 2d 749, 751 (1974).

*Western States Telephone Co.,* FCC Docket No. 76883, slip op. at 59–60 (Initial Decision of ALJ, released April 10, 1981).

**64.** Other courts have reached similar conclusions. Although the Fifth Circuit found some sort of duty to resist interconnection by other carriers if perceived not to be in the public interest, this was not based on any extensive analysis of authority, and is in any event of only tenuous relevance here as the court was interpreting a subsection of the FCA fundamentally different from that before us; interconnection of carriers is massive compared to that of most individual subscribers, and both the effects on the network and the carriers' regulatory duties may be substantially different from those involved in this appeal. *See Mid-Texas,* 615 F.2d at 1380–81. *Cf.* p. 738 & note 59 *supra* (no duty to file post-*Carterfone* tariff imposed by *Carterfone* decision).

FCA, it was] entitled to a measure of protection from the effects of the antitrust laws." *Id.* at 1381.

The court ruled that, in resolving the monopolization claim, the fact-finder was to consider the extent to which the regulatory scheme affected Bell's actions in refusing interconnection. *Id.* at 1385–90. The court concluded that: "The important issue in this case is whether Bell's action was reasonable under antitrust law in light of the relevant factors concerning the public interest standard." *Id.* at 1390. Thus, the Fifth Circuit too has adopted a standard of objective reasonableness in assessing a regulated entity's conduct under the antitrust laws. Those principles are applicable here.

Our views are consistent with this and other courts' decisions on the significance of regulation in an antitrust case in other than an immunity context.[65] In *International Tel. & Tel. Co. v. General Tel. & Elecs. Corp.*, 518 F.2d 913 (9th Cir. 1975) [*GT&E*], General Telephone & Electronics Corporation defended a charged violation of section 7 of the Clayton Act on the ground that it was part of a regulated, hence noncompetitively oriented industry, and argued that advantages were to be gained by further vertical integration of the telephone industry.[66] While dismissing the argument as irrelevant, this court clarified its position with regard to the effect of regulation:

This is not to say that the nature and extent of regulation is, in the absence of an exemption, irrelevant from a factual perspective. The impact of regulation on pricing and other competitive factors is too obvious to be ignored. In the absence of an exemption claim, the fact of regulation is significant, but not because it embodies a doctrinal scheme different from the antitrust law; the sole legal perspective is that afforded by the antitrust law. Rather, the impact of regulation must be assessed simply as another fact of market life.

*Id.* at 935–36 (footnote omitted).[67]

As the preceding discussion indicates, the proper role of antitrust courts is to accommodate the peculiar circumstances under which regulated entities operate. Professors Areeda and Turner state the proposition succinctly:

[A]ntitrust courts can and do consider the particular circumstances of an industry and therefore adjust their usual rules to the existence, extent, and nature of regulation. Just as the administrative agency must consider the competitive premises of the antitrust laws, the antitrust court must consider the peculiarities of an industry as recognized in a regulatory statute.

---

65. The Eighth Circuit, in *Sound, Inc. v. American Tel. & Tel. Co.*, 631 F.2d 1324 (8th Cir. 1980), implicitly adopted a similar view when it denied a telephone company antitrust immunity and designated for fact-finding at trial the question whether the company adopted a PCA requirement because it did not know how otherwise to protect the integrity of its own equipment. *See id.* at 1330 n.7. The Second Circuit has made a jury question of the propriety of the design of a PCA in an antitrust case challenging the design of the PCA, but not the filing of the underlying tariff. *See Northeastern Tel. Co. v. American Tel. & Tel. Co.*, 651 F.2d 76 (2d Cir. 1981).

66. In *GT&E*, implied immunity was not at issue, and GT&E did not even attempt to demonstrate that the dictates of the regulatory scheme imposed on it an obligation, either actual or perceived, to acquire the telephone companies. Rather, the sole claim was grounded in the advantages gained through vertical integra-

tion, an issue irrelevant even "in the absence of any regulation whatsoever." *GT&E*, 518 F.2d at 935. Since nothing unique or peculiar to the regulatory system caused, either directly or tangentially, the defendant's conduct, there was no reason to skew the doctrinal scheme of the antitrust laws.

67. The Supreme Court apparently has taken a similar view in *National Gerimedical Hospital v. Blue Cross*, 452 U.S. 378, 101 S.Ct. 2415, 69 L.Ed.2d 89 (1981), where, after refusing to accord Blue Cross implied antitrust immunity on the basis of its claim to have been acting to further the purposes of the National Health Planning and Resources Development Act of 1974, 42 U.S.C. § 3001, the Court noted that litigation on the merits should give attention to the "particular economic context" in which the alleged antitrust misconduct occurred. *See National Gerimedical*, 452 U.S. at 393 n.19, 101 S.Ct. at 2424 n.19.

I P. Areeda & D. Turner, *supra* note 55, at ¶ 223d. *See* Note, *supra* note 40, 57 Tex.L. Rev. at 825.

We thus recognize that those considerations advanced in favor of implied immunity, while not providing a blanket exemption, do bear on the case in a limited way. The logic of complying with a regulatory mandate is relevant as an antitrust defense, but the same logic has internal limits which do not justify any and all acts ostensibly taken in response to the FCA. There is no absolute antitrust immunity or exemption by virtue of federal or state law in this case, but the defendants below may offer to show that their actions were justified by the constraints of the regulatory schemes in which they operated.

REVERSED and REMANDED.

CLAIBORNE, District Judge (dissenting):

The cases of *DASA Corporation, etc. v. General Telephone Co. of California, et al.* (No. 77–2936) ["DASA"] and *Phonetele, Inc. v. American Telephone and Telegraph Co., et al.*, (No. 77–3877) ["Phonetele"] present the same issue: Is American Telephone & Telegraph Co. and its operating companies ["A.T. & T."] immune from liability under the Sherman Act (15 U.S.C. §§ 1 et seq.) with respect to competing manufacturers of "interconnection equipment" because of the way in which they are regulated by the Federal Communications Commission ("F.C. C.")? This issue has been heavily litigated of recent, and Courts and commentators are sharply divided. See generally, Note, *AT&T and the Antitrust Law: A Strict Test for Implied Immunity*, 85 Yale L.J. 254 (1975); *Essential Communications Systems, Inc. v. A.T. & T.*, 446 F.Supp. 1090 (D.N.J. 1978), *revd.*, 610 F.2d 1114 (3rd Cir. 1979); *Litton Systems, Inc. v. A.T. & T.*, 487 F.Supp. 942 (S.D.N.Y.1980) [in which District Judge Conner of the Southern District of New York declined to follow the 270 page recommendation of Magistrate Sinclair on this issue].

I

Phonetele manufacturers the "Phonemaster," which is a special purpose mini-computer, designed specifically to interface with the national telephone network. Phontele installs the Phonemaster on the customer's premises, at his/her telephone terminal. The Phonemaster then controls the amount of telephone service by restricting outgoing calls to selected area codes, exchange prefixes, and lines; it does this by electronically observing the outgoing dial signals, translating them, comparing them to a core memory, and then allowing or disallowing the call based upon the consumer's programmed restrictions. The Phonemaster, unlike the terminal, operates on 110 volt current.

DASA manufactures a telephone call diverter known as "Divert-a-Call." A call diverter can automatically transfer each incoming telephone call at one particular number to any other designated telephone anywhere within the United States or Canada.

The nation's telephone system consists of a switch network that links the facilities of more than 1,700 cooperating telephone companies extending throughout the country. The four basic elements of this network are the terminal equipment (such as the telephone itself located on the customer's premises), the pair of wires or "loop" that connects the telephone set to the central office, the switching equipment, and the trunk facilities that connect the central offices to each other. "Network control signals are electronic impulses which activate the devices that set up and take down connections between centers, control switches, and start and stop the equipment used for billing. Devices that generate or activate network control signals are a category of terminal equipment known as "network control signaling units," or "NCSU's." Automatic transfer devices such as "Divert-a-Call" and "Phonemaster" are NCSU's. Such devices, if not carefully designed, manufactured, installed, and/or maintained, can cause improper signals to be received at the central office, thereby disrupting systems operations and message accounting.

In 1966, the F.C.C. commenced its *Carterfone* proceedings with respect to A.T. & T. Tariff 132, which blanket and unqualifiedly prohibited customer-provided equipment. In 1968, the F.C.C. concluded that Tariff 132 was overbroad as applied to ancillary devices such as the Carterfone, which was not an NCSU but which merely provided a means of achieving a form of interconnection between the public toll telephone system and private mobile radio systems by acoustic and inductive coupling. *Use of the Carterfone Device in Message Telephone Service*, 13 F.C.C.2d 420 (1968). The F.C.C. ordered the telephone companies to submit a new tariff which would protect the telephone system against harmful devices and, in response thereto, A.T. & T. submitted Tariff No. 263, which became effective on January 1, 1969. This tariff permitted acoustic and inductive connections under specified conditions, and continued to prohibit direct electrical connection of customer-provided NCSU equipment, unless a customer wished to use indirect interconnection through a coupling arrangement furnished and maintained by the telephone company. Immediately after filing of the same, several parties filed objections thereto; however, the F.C.C. rejected these objections, holding that Tariff No. 263 was not in conflict with the prior *Carterfone* ruling. 15 F.C.C.2d 605; 18 F.C.C.2d 871. In its decision permitting revised tariff No. 263 to go into effect, the F.C.C. stated that it would undertake an extensive study to ascertain whether any modifications or limitations on the interconnection of customer-provided NCSU equipment were necessary, desirable and technically feasible.

Accordingly, the F.C.C. commissioned a study of the whole matter of interconnection by the National Academy of Sciences (cf. 18 F.C.C.2d 871) and ordered a Federal-State Joint Board investigation of interconnection in cooperation with the state regulatory agencies under 47 U.S.C. § 410(c) (cf. 35 F.C.C.2d 539). Additionally, both the National Association of Regulatory Utility Commissioners ("NARUC") and at least 17 different state commissions—including California—undertook their own independent investigations of this same problem during the same period. This led to an order by the F.C.C. in which it asserted "paramount" jurisdiction over the terms and conditions governing the interconnection of all equipment used in interstate communications, thereby permitting the F.C.C. effectively to limit the options available to the States in this area. *Telerent Leasing Corp.*, 45 F.C.C.2d 204, *affd., sub. nom., North Carolina Util. Comm'n v. F.C.C.*, 537 F.2d 787 (4th Cir. 1976), *cert. denied*, 429 U.S. 1027, 97 S.Ct. 651, 50 L.Ed.2d 631 (1976).

Based on a Report and recommended Order of the Federal-State Joint Board and after several revisions thereof the Commission released its First Report and Order on November 7, 1975, adopting a federal registration program for the regulation of interconnection of customer-provided devices. 56 F.C.C.2d 593. The Commission noted that former Tariff No. 263 was one manner in which to protect the network, but concluded that the approach of that tariff was unnecessarily restrictive in view of the Commission's finding that it would be technically and administratively feasible to establish a system of equipment registration which would provide the necessary minimal protection against network harm. If so registered with the F.C.C., such equipment no longer requires a protective connecting arrangement; but if not so registered, the telephone companies may continue to require the use of a protective connecting arrangement for the interconnection of NCSU's. The federal registration program promulgated by the F.C.C. is set forth in Sub-part 68 of the F.C.C.'s regulations (47 C.F.R. §§ 68.100 et seq.). A.T. & T. subsequently filed a revised tariff with the F.C.C. which purportedly reflects the requirements of the F.C.C.'s registration program. The new registration program will be subject to continuing review and modification by the Commission as. actual experience under the program warrants. 56 F.C.C.2d at 613.

Developments before the California Public Utilities Commission ("P.U.C.") have loosely paralleled those before the F.C.C.

General Telephone tariffs filed with the P.U.C. prior to 1966 prohibited the connection of customer-provided equipment to the telephone system. In 1966, the P.U.C. found a call diverter functionally similar to the Divert-a-Call not to present any significant hazard to the telephone system, and the P.U.C. ordered General Telephone to allow interconnection of that device without a connecting arrangement or to purchase and supply the device itself. DASA's predecessor-in-interest, Com-U-Trol, filed an action before the P.U.C. in February of 1972, to compel General Telephone to allow interconnection of the Divert-a-Call. Although the P.U.C. ordered that General "shall permit the direct electrical connection of Divert-a-Calls to the telephone network subject to the condition that complainant shall provide reasonable assurances that quality control, installation, and repair procedures ... necessary for the preservation of network integrity and safety will be uniformly followed," Com-U-Trol and General were unable to come to agreement on the necessary procedures. Subsequently, on October 24, 1973, the P.U.C. commenced a general investigation into the terms and conditions of interconnection of customer-provided equipment. On April 22, 1975, the P.U.C. issued an Interim Decision, which was eventually finalized in May, 1976 and which, like the F.C.C. *First Report*, adopted a dual system of direct electrical connection of certified devices and the use of protective connecting arrangements for uncertified devices.

II

The Communications Act of 1934, or Title 47, Chapter 5 of the United States Code, contains the statutory scheme by which the federal government regulates wire communications. The Act specifically confers jurisdiction over "all instrumentalities, facilities, and apparatus ... incidental to interstate communications services upon the Federal Communications Commission." 47 U.S.C. §§ 151, 153(a), 153(e). Under this regulatory scheme, Appellees, like other common carrier enterprises, are required to file tariffs describing all rates and practices, including the terms and conditions for the interconnection of customer-provided equipment, before service can be offered to the public. Cf. 47 U.S.C. § 203(a). No changes can be made in the tariffs once they are filed and published, except after ninety (90) days notice to the F.C.C. and to the public (47 U.S.C. § 203(b)(1)), unless the Commission exercises its discretion and does so pursuant to 47 U.S.C. § 203(b)(2). The Commission may not prescribe a new rate or practice contained within a telephone company tariff without first granting a full opportunity for a hearing before it. 47 U.S.C. § 204(a); *A.T. & T. v. F.C.C.*, 487 F.2d 865, 874 (2nd Cir. 1973). The Commission has the authority to institute an inquiry on its own motion with respect to matters raised before it (47 U.S.C. § 403), and whenever it conducts an investigation it has the duty to state its conclusions in writing (47 U.S.C. § 404). The Commission also has the power to refer any matter arising in the administration of the 1934 Act to a joint board to be composed of members from each of the states in which the wire communication affected by or involved in the proceeding takes place or is proposed, pursuant to 47 U.S.C. § 410, which power the F.C.C. in fact exercised in the case at bar.

After such a hearing, the F.C.C. is empowered with the duty to determine what the just and reasonable charge or the just, fair and reasonable classification, regulation or practice shall be and to make cease and desist orders accordingly. In other words, if the agency concludes that the tariff is not in compliance with the Act or regulations thereunder, it must order the tariff cancelled or modified as the circumstances warrant. 47 U.S.C. § 205(a). If the agency accepts the tariff and permits it to become effective, the regulatory statutes specifically require the carriers to enforce the tariff fully and fairly unless and until it has been superseded by a new tariff filed and reviewed under this same procedure. 47 U.S.C. § 203(c).

The standard under which the F.C.C. acts in administering the Act is not the standard of "free and unfettered competition," upon which the Sherman Act is premised (cf. *Northern Pac. R. Co. v. United States*, 356 U.S. 1, 4, 78 S.Ct. 514, 517, 2 L.Ed.2d 545 (1958)) but a standard broader than that, namely, the standard of protecting the public interest in communications. Cf. *Scripps-Howard Radio v. F.C.C.*, 316 U.S. 4, 14, 62 S.Ct. 875, 882, 86 L.Ed. 1229 (1942). By this, it is meant that all charges, practices, classifications and regulations for and in connection with such communication service shall be just and reasonable. 47 U.S.C. § 201(b). Thus, antitrust considerations may be relevant to the F.C.C.'s determination of the legality of a tariff under this Chapter, but they are not determinative, except where 47 U.S.C. § 202 applies directly; other factors which the F.C.C. takes into account in determining the "public interest" include network safety and efficiency, the need of the public for reliable service at reasonable rates, the proper allocation of the rate burden in the public interest, the financial integrity of the carriers, and the future needs of both the users and carriers. Compare 62 F.C.C.2d 997 (1977); 59 F.C.C.2d 344 (1976); 34 F.C.C. 949 (1963); 17 F.C.C. 152 (1952); 10 F.C.C. 244 (1943); and see *Mid-Texas Communications v. American Tel. & Tel. Co.*, 615 F.2d 1372, 1379 (5th Cir. 1980), and cases cited therein.

Where a common carrier violates this standard or omits to do anything which is required by the Act to be done, it can be liable to the person(s) injured thereby for damages plus attorney's fees. 47 U.S.C. § 206. Jurisdiction is in the United States District Courts or with the Commission, but not both simultaneously. 47 U.S.C. § 207. In fact, the F.C.C. currently has pending before it a reactivated proceeding involving alleged damages resulting from the post-*Carterfone* interconnection tariffs. *Western States Tel. Co. v. A. T. & T.*, 19 F.C.C.2d 1068 (1969), 62 F.C.C.2d 1170 (1977). The District Courts have jurisdiction to enforce any orders of the F.C.C. pursuant to 47 U.S.C. § 401.

## III

Both appellants are relatively new businesses, having spawned in the early 1970's as a result of the post-*Carterfone* events heretofore described. Phonetele and DASA both filed their actions in 1974. The essence of Phonetele's complaint is that the defendants have conspired to limit sales of the Phonemaster by restricting the manner in which the device can be "interconnected" with the national telephone system. While the complaint does not specifically so state, Phonetele must concede as a matter judicially noticeable that the sole means by which Appellees have allegedly done so is by the filing of the tariffs heretofore described. DASA apparently alleges that General Telephone and Ford Industries, Inc. (Ford), a manufacturer of a competing call diverter for General Telephone, have conspired to eliminate competition for the production, sale and leasing of automatic call diverters; that General has filed "anticompetitive" tariffs with the P.U.C. with the purpose of eliminating and restraining competition in the field of peripheral telephone equipment; that after such tariffs were determined to be unlawful, General unnecessarily required a coupler supplied by it for the attachment of the Divert-a-Call to the telephone system; that the charges for these couplers were unreasonable; that the couplers were designed to prevent the proper functioning of the call diverter; that General and co-conspirators sought to prevent DASA from obtaining rulings from the P.U.C. and other public bodies as to the validity of tariff provisions relating to the interconnection of customer-provided terminal equipment; and that General conspired with Ford so that Ford would be able to control the market for call diverters.

The District Court in both cases below granted the Appellees' motion for judgment on the pleadings/motion to dismiss on the grounds that the subject of interconnection of terminal equipment with the telephone network system is impliedly immune from antitrust attack in the federal courts. *Phonetele, Inc. v. A.T. & T.*, 435 F.Supp. 207, 214 (C.D.Cal.1977). These appeals follow.

## A

The starting point for any consideration of the issue at bar[1] are the well settled principles that repeal of the antitrust laws by implication is not favored and not casually to be allowed; only where there is a "plain repugnancy between the antitrust and regulatory provisions" will repeal be implied. *United States v. Philadelphia National Bank*, 374 U.S. 321, 350–351, 83 S.Ct. 1715, 1734–1735, 10 L.Ed.2d 915 (1963), and cases cited therein. Repeal is to be regarded as implied only if necessary to make regulatory provisions work, and even then only to the minimum extent necessary. *Silver v. New York Stock Exchange*, 373 U.S. 341, 357, 83 S.Ct. 1246, 1257, 10 L.Ed.2d 389 (1963).

While these principles tend to lead in the direction of the majority opinion, they cannot be considered in a vacuum. Rather, one must examine them in operation in recent Supreme Court cases, and see where this case fits within the spectrum already established by the Supreme Court. The four most recent Supreme Court opinions on the issue of implied antitrust immunity are: *Gordon v. New York Stock Exchange*, 422 U.S. 659, 95 S.Ct. 2598, 45 L.Ed.2d 463 (1975); *United States v. National Association of Securities Dealers, Inc.*, 422 U.S. 694, 95 S.Ct. 2427, 45 L.Ed.2d 486 (1975) ["NASD"]; *Hughes Tool Company v. Trans World Airlines, Inc.*, 409 U.S. 363, 93 S.Ct. 647, 34 L.Ed.2d 577 (1973); and *Cantor v. Detroit Edison Co.*, 428 U.S. 579, 96 S.Ct. 3110, 49 L.Ed.2d 1141 (1976). After reading these cases and gleaning their intelligence, I believe that any Court faced with the issue at bar must ask the following questions: 1) Has Congress conferred upon the regulatory agency sufficient authority to regulate the conduct which is alleged to be anticompetitive? 2) Does the history of the regulatory agency's activities with respect to the regulation of this conduct suggest no laxity in the exercise of this authority? 3) If the federal antitrust laws were to be construed by a federal court as outlawing the regulated activity, is there reason to believe that the agency's regulation of the industry in question will no longer be able to function effectively? If a Court answers all three questions in the affirmative, then it must find implied immunity and dismiss the antitrust action.

The *Gordon* case involved an action against the New York Stock Exchange (NYSE), the American Stock Exchange (AMEX) and two member firms thereof, claiming that the system of fixed commission rates utilized by the Exchanges for the periods of time in question violated §§ 1 and 2 of the Sherman Act. The Supreme Court affirmed the dismissal of the complaint. First, the Court noted that the general policy of the Securities Exchange Act of 1934 was of self-regulation by the exchanges coupled with oversight by the Securities and Exchange Commission (S.E.C.). 422 U.S. at 666–667, 95 S.Ct. at 2603–2604. The Court then thoroughly examined the actual post-1934 experience of S.E.C.—imposed rates on the NYSE and AMEX; to summarize, the S.E.C. gradually abolished said rates between 1934 and 1975, refusing to take the position that fixed rates were required in all instances, but recognizing the established practice of minimum rates and the practicality that some level of fixed rates was necessary for a large period of time in order to insure the financial health of the brokers in question and that an immediate withdrawal of minimum rates could have disastrous financial consequences upon the brokers as well as indirect but consequential harm to investors. The

---

1. At oral argument we requested supplemental briefs on the issue of whether the activities of Appellees were immune from antitrust litigation due to state regulation under the doctrine of *Parker v. Brown*, 317 U.S. 341, 63 S.Ct. 307, 87 L.Ed. 315 (1943) and its progeny. Upon reconsideration, this case is inappropriate for a consideration of that issue. First of all, it was not raised to either Court below. Secondly, the

F.C.C. in its *Telerent* decision effectively preempted the states from regulating the area of the interconnection industry; to the extent that the states regulate at all, at least with respect to the California P.U.C., it is in a manner perfectly consistent with the F.C.C. registration program of 47 C.F.R. §§ 68.100 et seq. See *Phonetele, Inc. v. American Telephone & Telegraph*, 435 F.Supp. at 213, n. 12.

Court also noted that Congress, while expressing some dissatisfaction with the progress of the S.E.C. in implementing competitive rates, was generally content to allow the S.E.C. to proceed without new legislation. 422 U.S. at 668–682, 95 S.Ct. at 2606–2611. The Court then stated:

> ... [T]o deny antitrust immunity with respect to commission rates would be to subject the exchanges and their members to conflicting standards. It is clear from our discussion ... that the commission rate practices of the exchanges have been subjected to the scrutiny and approval of the S.E.C. If antitrust courts were to impose different standards or requirements, the exchanges might find themselves unable to proceed without violation of the mandate of the courts or of the S.E.C. Such different standards are likely to result because the sole aim of antitrust legislation is to protect competition, whereas the S.E.C. must consider, in addition, the economic health of the investors, the exchanges, and the securities industry. Given the expertise of the S.E.C., the confidence the Congress has placed in the agency, and the active roles the S.E.C. and the Congress have taken, permitting courts throughout the country to conduct their own antitrust proceedings would conflict with the regulatory scheme authorized by Congress rather than supplement the scheme.

422 U.S. at 689–690, 95 S.Ct. at 2614–2615.

The *NASD* case involved, *inter alia*, an alleged conspiracy and horizontal combination among NASD's members to prevent the growth of a secondary dealer market in the purchase and sale of mutual-fund shares.[2] Section 22(f) of the Investment Company Act of 1940 authorizes mutual funds to impose restrictions on the negotiability and transferability of shares, provided they conform with the fund's registration statement and do not contravene any rules and regulations that the S.E.C. may prescribe in the interests of the holders of the outstanding securities. Section 22(d) provides that no dealer shall sell mutual fund shares to any person except a dealer, a principal underwriter, or the issuer, except at a current public offering price described in the prospectus. The Maloney Act of 1938 (§ 15A of the Securities Exchange Act of 1934) supplements the S.E.C.'s regulation of over-the-counter markets by providing a system of cooperative self-regulation through voluntary associations of brokers and dealers. In affirming the dismissal of the complaint as to Count I, the Supreme Court held that where Count I alleged activities which were neither required by Section 22(d) nor authorized by Section 22(f), but where the S.E.C.'s supervisory powers over the NASD is extensive, and weighs competitive concerns as a factor in regulating the secondary market of mutual fund shares purchases and sales, Count I is immune from antitrust liability. 422 U.S. at 730–733, 95 S.Ct. at 2428–2429. In particular, the Court stated:

> There can be little question that the broad regulatory authority conferred upon the S.E.C. by the Maloney and Investment Company Acts enables it to monitor the activities questioned in Count I, and the history of Commission regulations suggests no laxity in the exercise of this authority. To the extent that any of appellees' ancillary activities frustrate the S.E.C.'s regulatory objectives it has ample authority to eliminate them.
>
> Here implied repeal of the antitrust laws is necessary to make the regulatory scheme work. [cite] In generally similar situations, we have implied immunity in particular and discrete instances to assure that the federal agency entrusted with regulation in the public interest could carry out that responsibility free from the disruption of conflicting judgments that might be voiced by courts exercising jurisdiction under the antitrust laws. [cites] In this instance, maintenance of an antitrust action for activities so directly related to the S.E.C.'s responsibilities

---

2. For the sake of brevity discussion of the alleged vertical conspiracy and Counts II–VIII of

that complaint is omitted here.

poses a substantial danger that appellees would be subjected to duplicative and inconsistent standards. This is hardly a result that Congress would have mandated. We therefore hold that with respect to the activities challenged in Count I of the complaint, the Sherman Act has been displaced by the pervasive regulatory scheme established by the Maloney and Investment Company Acts.

422 U.S. at 734–735, 95 S.Ct. at 2450.

In *TWA*, the appellee brought an antitrust action against Hughes Tool Co. (Toolco) and others under the Sherman Act as a result of the manner in which Toolco had exercised its controlling interest in TWA, with particular reference to Toolco's asserted acts to control and dictate the acquisition and financing of aircraft by TWA. As an organization engaged in phases of aeronautics, Toolco could not acquire control of an air carrier such as TWA without consent of the Civil Aeronautics Board (C.A.B.). In 1944, the C.A.B. approved de facto control of TWA by Toolco as comporting with the provision of § 408 of the Federal Aviation Act. That provision permits acquisitions of control that the C.A.B. finds are not inconsistent with the public interest and that will not result in monopoly. Section 415 of the Act endows the C.A.B. with the power to supervise all transactions between carriers and their owners on a continuing basis. And, Section 414 immunizes any conduct approved by a C.A.B. order issued under § 408 from antitrust liability. The C.A.B., after full hearings into the Toolco-TWA relationship, found that Toolco's financial and other support was of great importance to TWA and concluded that the continued interest of Toolco in TWA appears to be essential to the best interests of the carrier and the public. The C.A.B.'s approval was made subject to the conditions of the 1944 order. As a result, from 1944 to 1960, every acquisition and lease of aircraft by TWA from Toolco and each financing by TWA from Toolco received C.A.B. approval pursuant to § 408.

The Supreme Court reversed a default judgment in favor of TWA, holding that the conduct of Toolco was impliedly immune from the sanctions of the antitrust laws. Appellants herein seek to distinguish this case and the case upon which the Supreme Court based its ruling in *TWA, Pan American World Airways, Inc. v. United States*, 371 U.S. 296, 83 S.Ct. 476, 9 L.Ed.2d 325 (1963), on the basis that the Communications Act of 1934 does not have provisions similar to Sections 408 and 414 of the Federal Aviation Act. While this fact is true, the distinction is without a difference since it is clear that the *TWA* Court did not base its holding or restrict its holding to a strict interpretation of those two sections. Rather, the Court stated:

> Competition and monopoly—two ingredients of the antitrust laws—are thus standards governing the CAB's exercise of authority in granting, allowing, or expanding or contracting the control which Toolco had over TWA by reason of the various orders issued by the CAB under § 408. In this context, the authority of the Board to grant the power to "control" and to investigate and alter the manner in which that "control" is exercised leads us to conclude that this phase of CAB jurisdiction . . . preempts the antitrust field.

409 U.S. at 385, 93 S.Ct. at 659–660.

> We repeat, however, what we said in the *Pan American* case that the Federal Aviation Act does not completely displace the antitrust laws . . . One of the most conspicuous exceptions would be the combination or agreement between two air carriers involving trade restraints. [cite] There may be other exceptions. But where, as here, the CAB authorizes control of an air carrier to be acquired by another person or corporation, and where it specifically authorizes as in the public interest specific transactions between the parent and the subsidiary, the way in which that control is exercised in those precise situations is under the surveillance of the CAB, not in the hands of those who can invoke the sanctions of the antitrust laws.

409 U.S. at 387, 93 S.Ct. at 661.

Finally, in *Cantor*, the respondent, a private utility which was the sole supplier of

electricity in southeastern Michigan, also furnished its residential customers, without additional charge, with almost 50% of the most frequently used standard-sized light bulbs under a longstanding practice antedating state regulation of electric utilities. This marketing practice for light bulbs is approved, as part of respondent's rate structure, by the Michigan Public Service Commission, and may not be changed unless and until respondent files, and the Commission approves, a new tariff. The Supreme Court held that the respondent's marketing practice was not immune from antitrust liability, stating:

> Michigan's regulatory scheme does not conflict with federal antitrust policy and, conversely, if the federal antitrust laws should be construed to outlaw respondent's light bulb-exchange program, there is no reason to believe that Michigan's regulation of its electric utilities will no longer be able to function effectively. Regardless of the outcome of this case, Michigan's interest in regulating its utilities' distribution of electricity will be almost entirely unimpaired. We conclude that neither Michigan's approval of the tariff filed by respondent, nor the fact that the lamp-exchange program may not be terminated until a new tariff is filed, is a sufficient basis for implying an exemption from the federal antitrust laws for that program.

428 U.S. at 598, 96 S.Ct. at 3121.

With these four cases, the statutory scheme and the activity of the F.C.C. in regulating the interconnect industry in mind, it is readily apparent to me that the three aforementioned questions must be answered in the affirmative. On this basis, then, I respectfully dissent.

As to the first question, Congress has given the power to private individuals to sue A.T. & T. and its operating companies for damages where it implements a tariff which constitutes an unjust or unreasonable practice. As heretofore stated, the standard of "unjust and unreasonable" can include but is not necessarily restricted to anticompetitive practices.

As to the second question, it is clear that the F.C.C. has taken an active interest in regulating the entire field of interconnection, to the point of preempting the state public utility/service commissions in this regard. And, after seven years of concentrated study, it has adopted a "middle ground." That is to say, it has neither adopted A.T. & T.'s position of totally restricted competition nor Appellants' position of totally unfettered competition, but a registration program which is designed to protect the companies with sound interconnection products against the tariff practices of A.T. & T. and simultaneously to protect A.T. & T. and the public from companies with unsound interconnection products.

As to the third question, since the Court is to deal in theoretical possibility, I must conclude that circumstances could exist whereby the judgment of a federal court would disenable the F.C.C. to function effectively in this particular field of regulation. If I assume for the time being that Phonemaster's requirement of 110-volt current to operate must require a coupling arrangement which requires A.T. & T. engineering expertise, and if I assume for the time being that Divert-a-Call is or will become a hazard to the network system and cause both annoyances to the customers and disruption to A.T. & T.'s billing procedures, then it becomes obvious that the F.C.C. should have the power to prevent or restrict Appellants' ability to compete in the marketplace; the public interest would require no less. However, anticompetitive practices on the part of A.T. & T. could constitute *per se* violations of the Sherman Act and thereby require that Appellants be allowed to compete and A.T. & T. pay treble damages. Of course, these assumptions may well prove to be totally without foundation in time. However, the point is clear: this is not a case of a public utility commission whose legislative mandate clearly has nothing to do with the regulation of the light bulb sales industry, as in *Cantor*. The F.C.C. is to act in the public interest in the regulation of the communications industry, and the history surrounding this action indi-

cates that the F.C.C. has deemed the public interest in the interconnect industry to be vital. Whether wisely or not, it has formulated a plan by which to regulate that industry, and an antitrust judgment could well indeed make a mockery of that plan.

## B

I am aware that in urging the affirmance of the Courts below I would create a conflict, in that the Third Circuit in *Essential, supra,* faced with the same precise issue and the same operating facts, held that A.T. & T. and its operating companies could not be shielded impliedly from antitrust immunity. After studying that opinion, however, and with all due respect for the Third Circuit, I simply find it to be unpersuasive, especially in light of *Gordon* and *NASD* and the total lack of attention which the *Essential* Court gave to those two cases.

In arriving at its holding, the *Essential* Court drew a distinction between a customer for communications services and a competitor for communications services. The Court reasoned that the F.C.C. has the primary responsibility to insure that enforcement of the common carrier's duty to offer service to all who seek it on reasonable terms and conditions, but the federal courts, not the F.C.C., has the primary responsibility for the enforcement of antitrust laws which implies the permission of potential competitors in communications services to have access to the Bell System network. 610 F.2d at 1122.

It is difficult to glean the authority from which the *Essential* Court derived that distinction; most certainly, it did not derive the distinction from the *NASD* and *Gordon* cases, which involved alleged restrictions of competitors of the regulated industries in question and nonetheless found implied antitrust immunity to exist. It appears from the *Essential* opinion that that Court derived the distinction from some dictum in *Keogh v. Chicago & Northwestern Ry. Co.,* 260 U.S. 156, 161–163, 43 S.Ct. 47, 49–50, 67 L.Ed. 183 (1922), involving an action against a shipper who had filed tariffs with the I.C.C. by a customer.

In this regard the *Essential* Court plainly misread *Keogh,* as that case had nothing to do with the doctrine of implied antitrust immunity. The holding of *Keogh* is that a railroad shipper may not bring an action under 15 U.S.C. § 15 for rebate of rates found by the I.C.C. to be reasonable and nondiscriminatory and fixed accordingly; this holding is clearly a resolution of a conflict between the Interstate Commerce Act and the Clayton Act. Cf. 260 U.S. at 162–163, 43 S.Ct. at 49. The *Keogh* Court did say, though, that under 15 U.S.C. §§ 1 et seq. a combination of carriers to fix reasonable and nondiscriminatory rates may be illegal, and this would be actionable under the antitrust laws. Cf. 260 U.S. at 161–162, 43 S.Ct. at 49.

I do not think that an "implied immunity distinction" can be read into *Keogh,* since that case dealt not with the pervasive regulation of a regulatory agency with broad powers, as here, but statutory construction with respect to specifically defined powers of a regulatory agency. To the extent that I am wrong in that regard, however, it is correct to say that the Supreme Court rendered the "*Keogh* distinction" meaningless ten years later in *United States Navigation. Co., Inc. v. Cunard S. S. Co., Inc.,* 284 U.S. 474, 52 S.Ct. 247, 76 L.Ed. 408 (1932). *Cunard* involved an antitrust action against shippers who allegedly conspired to fix general tariff rates and establish lower contract rates for shipping among the general members with the intent of driving the plaintiff, a competitor, out of business. In other words, in the lingo of the *Essential* Court, this action involved not customers of a regulated industry, but competitors. Nonetheless, the Supreme Court affirmed the dismissal of the action. Noting that this matter as well lay within the jurisdiction of the I.C.C. under the Shipping Act (46 U.S.C. §§ 801 et seq.), the *Cunard* Court actually extended, as opposed to distinguished, the *Keogh* opinion as follows:

> A comparison of the enumeration of wrongs charged in the bill with the provisions of the sections of the Shipping Act above outlined conclusively shows, with-

out going into detail, that the allegations either constitute direct and basic charges of violations of these provisions, or are so interrelated with such charges as to be, in effect, a component part of them; and the remedy is that afforded by the Shipping Act, which to that extent supersedes the antitrust laws. Compare *Keogh v. C. & N. W. Ry. Co.* [cite omitted]. The matter therefore is within the exclusive preliminary jurisdiction of the Shipping Board. The scope and evident purpose of the Shipping Act, as in the case of the Interstate Commerce Act, is demonstrative of this conclusion . . . .

284 U.S. at 485, 52 S.Ct. at 250–251. See also *Far East Conference v. United States,* 342 U.S. 570, 72 S.Ct. 492, 96 L.Ed. 576 (1952).

While that was the holding of the *Essential* Court, three other factors appeared to play a part in that Court's *ratio decidendi*: first, that nothing in the 1934 Act explicitly directs the F.C.C. when exercising its authority to take into account antitrust considerations (610 F.2d at 1120) second, the statutory scheme also includes a "savings clause," Section 414 which, combined with 47 U.S.C. § 221(a), conferring express immunity from antitrust litigation in a situation not applicable herein, demonstrates that no blanket immunity from antitrust law was intended by Congress (610 F.2d at 1120); and third, that in the *Essential* Court's opinion, the fact that the F.C.C. suspended its judgment on the question of interconnection did not rise to the level of agency activity requiring a finding of implied immunity (610 F.2d at 1124).

The first and the third factors fly in the face of the *Gordon* and the *NASD* opinions. Neither statutory scheme in those cases involved a specific statute which required the S.E.C. to consider competitive considerations in regulating the broker-dealers in question; yet, the Supreme Court demonstrated that the history and practice of that regulatory agency was to consider that factor, along with other factors, in determining the public interest. So it is here. And, the F.C.C. suspended its judgment with re-

spect to the enormous problem of interconnection for a period of time exceeded by the S.E.C.'s suspension of its judgment pending further study and review in *Gordon*; yet, all nine justices of the *Gordon* Court were satisfied that the S.E.C. was active enough in the regulation of broker commission rates to find implied immunity therein.

The second factor states the key argument presented by Appellant Phonetele and the United States, appearing as *amicus curiae,* 47 U.S.C. § 221(a), or the Willis-Graham Act, grants the F.C.C. the exclusive right to consolidate telephone companies or allow existing companies to acquire the whole or part of another, free from any potentially or actually conflicting Acts of Congress. 47 U.S.C. § 414 states that "nothing in this chapter contained shall in any way abridge or alter the remedies now existing at common law or by statute but the provisions of this chapter are in addition to such remedies." From these two statutes the argument is that Congress clearly expressed its intent that A.T. & T. be subject to antitrust remedies, except in the limited situation of Section 221(a); and since Section 221(a) clearly has no application to this lawsuit, Appellees must be subject to potential treble damages under the Sherman Act.

The existence of the saving clause does not alter the well-settled principle that persons such as the Appellants must exhaust their administrative remedies prior to bringing an action in a court of law. *United States Navigation Co. v. Cunard S. S. Co., supra,* 284 U.S. at 485–486, 52 S.Ct. at 251, and cases cited therein. And, in the field of antitrust litigation, dismissal of antitrust suit, where an administrative remedy has superseded the judicial one, is the usual course. *Pan American World Airways, Inc. v. United States, supra,* 371 U.S. at 313, n. 19, 83 S.Ct. at 486–487, n. 19, and cases cited therein. Thus, the existence of the saving clause has no effect upon the doctrine of implied immunity. See also *Pan American World Airways, Inc., supra,* 371 U.S. at 321, 83 S.Ct. at 490 (J. BRENNAN, Dissenting).

More fundamentally, this Court rejected the argument presented based upon Section 221(a) five years ago in the case of *International T. & T. Corp. v. General T. & E. Corp.*, 518 F.2d 913 (9th Cir. 1975). That case involved an antitrust action brought by I.T. & T. against G.T. & E., alleging that G.T. & E.'s acquisitions of 33 telephone operating companies had enabled it to effect a growing foreclosure of competition within the telecommunications equipment-manufacturing industry. In dictum the Court stated:

> ... The availability of a statutory exemption upon application to the FCC greatly reduces the danger of collision between the "two regimes ..." and even if a statutory exemption is not obtained [under 47 U.S.C. § 221(a)] or is not available a defendant can make a claim of implied immunity which will be tested under the "repugnancy" standards of *Philadelphia National Bank [supra]* and its successors, thus insuring that the policies of the regulatory statute will not be thwarted.

518 F.2d at 918–919. There are two circumstances in which a court may look beyond the express language of a statute in order to give force to Congressional intent: where the statutory language is ambiguous; and where a literal interpretation would thwart the purpose of the overall statutory scheme or lead to an absurd result. *International T. & T. Corp. v. General T. & E. Corp., supra* at 917–918, and cases cited therein. In this case, if one were to interpret Section 221(a) to mean that that was the only instance in which telephone companies were immune from antitrust litigation, such an interpretation would thwart the purpose of the overall statutory scheme. If the F.C.C. had no power to consider the anticompetitive acts of the common carriers under its jurisdiction, the result might well be different. But, it is undisputed that the F.C.C.'s powers are very broad and its mandate to protect the public interest includes the power to consider such anticompetitive acts which, in the case of the interconnect industry, it has done. And, as is evident from the decisions of the F.C.C. heretofore cited, the F.C.C. does not and cannot consider itself bound exclusively by principles of competition in protecting the public interest.

I cannot agree with the majority's decision to remand. The majority states:

> We thus recognize that those considerations advanced in favor of implied immunity, while not providing a blanket exemption, do bear on the case in a limited way. The logic of complying with a regulatory mandate is relevant as an antitrust defense, but the same logic has internal limits which do not justify any and all acts ostensibly taken in response to the FCA. There is no absolute antitrust immunity or exemption by virtue of federal or state law in this case, but the defendants below may offer to show that their actions were justified by the constraints of the regulatory schemes in which they operated.

These were the issues squarely before the trial judge and decided by him in an eloquent and brilliant decision. It defies logic to remand issues already heard and decided.

I recognize that this dissent is authored in a time in which it is politically fashionable to criticize regulatory agencies for their very existence and to criticize the telephone companies for their very existence as a monopoly. Nonetheless, we are first and foremost a nation of laws and the principle of *stare decisis* is the single most important key to the cohesiveness of our society. After examining the principles of law in the factual settings of *Gordon* and *NASD*, and after examining the extent to which the F.C.C. has attempted to regulate the interconnection industry, I find it inconceivable to do anything but affirm. Therefore, I respectfully dissent.